# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-4083

_____

United States of America,        *

           *

         Appellee,        *

           *       Appeal from the United States

        v.           *       District Court for the

           *       Western District of Missouri.

Robert Ray Courtney,        *

           *       [PUBLISHED]

         Appellant.       *

_____

Submitted: September 9, 2003
Filed: April 5, 2004

_____

Before LOKEN, Chief Judge, McMILLIAN and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Robert Ray Courtney, a pharmacist, diluted several chemotherapy drugs before distributing them for administration to cancer patients. His profit-making scheme was detected when one of the doctors who bought from Courtney became suspicious that he was selling more chemotherapy drugs than he was buying from the manufacturers. The doctor took a dose of Taxol that Courtney had recently supplied for one of her patients and sent it to a lab for analysis. The lab reported that it contained 32% of the Taxol it was supposed to contain. The doctor then met with FDA and FBI agents.

The federal agents tested seven additional samples of Gemzar and Taxol that Courtney had supplied for the doctor's patients. They found that the doses contained from 17% to 50% of the chemotherapy drugs they were supposed to contain. The federal agents then had the doctor order doses of Platinol, Zofran, Gemzar, Taxol, and Paraplatin from Courtney using fictitious patient names. Lab testing revealed that these samples contained from 0% to 65% of the dosages that the doctor had ordered and that Courtney had represented they contained.

Authorities executed a search warrant at Courtney's pharmacy, and he was arrested and indicted. He pleaded guilty to eight counts of product tampering causing serious bodily injury, in violation of 18 U.S.C. § 1365(a)(3) (2002), and twelve counts of adulterating or misbranding a drug, in violation of 21 U.S.C. § 331(k).

As part of his written plea agreement, Courtney stipulated to the following factual basis for the eight product-tampering offenses. He diluted a dose of Taxol for each of two patients, resulting in serious bodily injury to them when it was administered. He diluted a dose of Gemzar for each of six patients, resulting in serious bodily injury to them when it was administered. Courtney stipulated to the following factual basis for the twelve adulterating/misbranding counts. When the doctor ordered the chemotherapy for the fictitious patients, Courtney supplied six doses of Gemzar and Taxol, each of which he had adulterated by dilution but mislabeled as undiluted.

Courtney also stipulated to the following crimes beyond his twenty offenses of conviction. As to the eight patients who were named in the product-tampering charges, he diluted fifty additional doses of Gemzar and Taxol that were administered to them. As to twenty-six more patients who were not identified in the indictment, Courtney diluted 102 doses of Gemzar and Taxol that were administered to them. Courtney also admitted that he had sold stolen Gemzar and Taxol, that he had diluted

2

Platinol and Paraplatin, and that he had caused false Medicare claims to be filed by not disclosing his tampering to the physicians to whom he distributed diluted drugs.

The district court[1] made the following Sentencing Guidelines calculations. Each of the eight product-tampering convictions was placed in a single-count group because each involved a different victim. See U.S. Sentencing Guidelines Manual (USSG) § 3D1.2(b) (2000). Each single-count group carried an adjusted offense level of thirty-five: a base offense level of twenty-five, see USSG § 2N1.1(a), a four-level enhancement for causing life-threatening bodily injury, see USSG § 2N1.1(b)(1)(A), a two-level enhancement because the victims were vulnerable, see USSG § 3A1.1(b)(1), a two-level enhancement because there was a large number of vulnerable victims, see USSG § 3A1.1(b)(2), and a two-level enhancement for abuse of a position of trust and use of a special skill, see USSG § 3B1.3.

The twelve adulterating/misbranding convictions were grouped together. The group carried an adjusted offense level of twenty-four: a base offense level of six, see USSG § 2N2.1(a), an eight-level enhancement for the value of the diluted drugs, see USSG § 2F1.1(b)(1)(I), a two-level enhancement for more than minimal planning and a scheme to defraud more than one victim, see USSG § 2F1.1(b)(2), a two-level enhancement for the risk of serious bodily injury, see USSG § 2F1.1(b)(7)(A), a two-level enhancement because the victims were vulnerable, see USSG § 3A1.1(b)(1), a two-level enhancement because there was a large number of vulnerable victims, see USSG § 3A1.1(b)(2), and a two-level enhancement for abuse of a position of trust and use of a special skill, see USSG § 3B1.3.

Under the grouping rules, the combined offense level was determined by beginning with the offense level, thirty-five, for the group with the highest offense

---

[1] The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

3

level. Each of the eight product-tampering single-count groups received one unit apiece because they were equally serious. See USSG § 3D1.4(a). The group containing the twelve adulterating/misbranding counts received no units because it was nine or more levels less serious than the product-tampering groups. See USSG § 3D1.4(c). Although there were eight units, the grouping rules apply a flat five-level offense-level increase regardless of how many more than five units there are. See USSG § 3D1.4. Courtney's highest offense level was thus increased by five levels, bringing his combined offense level to forty. He received a three-level reduction for acceptance of responsibility, see USSG § 3E1.1, making his total final adjusted offense level thirty-seven. With a Category I criminal history, his Guidelines imprisonment range was 210-262 months.

The district court departed upward by three offense levels to level forty, which carries a Guidelines imprisonment range of 292-365 months, and imposed a 360-month prison sentence within that range. The court justified its upward departure on four grounds: the grouping rules disregarded Courtney's significant number of additional offenses, Courtney significantly endangered public health, Courtney's conduct caused extreme psychological injury to his victims, and the Guidelines calculations did not take into account Courtney's uncharged criminal conduct. The experienced district judge stated that, in his view, any one of the four grounds was sufficient to justify the three-level upward departure.

Courtney appeals the district court's upward departure. Because we conclude that at least two of the reasons cited by the district court solidly support the three-level upward departure, we affirm.

I.

During the pendency of Courtney's appeal, the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today (PROTECT) Act of 2003 was

enacted. Prior to the PROTECT Act, we would have reviewed the district court's departure under a unitary abuse-of-discretion standard. Subsequent to the PROTECT Act, we review de novo whether the factors upon which the district court relied advance the objectives set forth in 18 U.S.C. § 3553(a)(2), are authorized under 18 U.S.C. § 3553(b), and are justified by the facts of the case. See United States v. Agee, 333 F.3d 864, 866-67 (8th Cir. 2003). We may apply the new standard of review to pending appeals, see United States v. Hutman, 339 F.3d 773, 775 (8th Cir.), cert. denied, 124 S. Ct. 842 (2003), particularly when, as here, stricter scrutiny of the district court's upward departure is to the defendant's advantage. After the PROTECT Act, we continue to review the district court's factual findings for clear error and the reasonableness of a permissible departure for abuse of discretion. See United States v. Flores, 336 F.3d 760, 763 (8th Cir. 2003).

## II.

One reason the district court departed upward was that the Guidelines did not provide any incremental punishment for Courtney's seventh and eighth product-tampering convictions, or for his additional uncharged but admitted crimes. "A plea agreement (written or made orally on the record) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those offense(s)." USSG § 1B1.2(c). Courtney stipulated in his written plea agreement that he had diluted fifty additional doses of chemotherapy drugs that were administered to the eight patients named in the indictment, and that he had diluted 102 doses of chemotherapy drugs that were administered to twenty-six more patients. Under this provision of the Guidelines, Courtney's Guidelines calculations should have proceeded as if he had been convicted of 152 additional product-tampering charges.[2]

---

[2] Because the presentence report overlooked the proper treatment of these 152 additional offenses, so did the district court. Although this was error, we are satisfied

5

The grouping rules should have been applied to these 152 offenses, along with Courtney's twenty offenses of conviction. See USSG § 1B1.2, comment. (n.3); United States v. Collar, 904 F.2d 441, 443 (8th Cir. 1990). When the eight product-tampering counts in the indictment are grouped with the fifty additional product-tampering offenses against the eight victims identified in the indictment, the result is that Courtney has eight multiple-count groups rather than eight single-count groups. See USSG § 3B1.2(b). Turning to the 102 product-tampering offenses involving the twenty-six victims not identified in the indictment, these offenses should have been grouped by victim, resulting in twenty-six additional groups. See id. The grouping of Courtney's twelve adulterating/misbranding convictions into one multiple-count group would have remained the same. There would have been a total of thirty-four product-tampering groups and one adulterating/misbranding group.

Courtney's combined offense level would have been the same. The adulterating/misbranding group still would have received no units because it was nine or more levels less serious than the product-tampering groups. Each of the thirty-four product-tampering groups would have received one unit apiece because they were equally serious. Although there would have been thirty-four rather than eight units, Courtney still would have received the same five-level offense-level increase under USSG § 3D1.4 that applies regardless of how many more than five units are present.

The district court correctly cited the provision of the Guidelines that specifically authorizes a departure when the flat five-level increase disregards a significant number of units: "Inasmuch as the maximum increase provided in the

---

that it was harmless to Courtney. Given that the district court based its upward departure on an undercounted number of offenses, we have no doubt that if presented with the proper count, the court would have departed as far upward as it did. See Williams v. United States, 503 U.S. 193, 203 (1992) (when district court misapplies Guidelines, remand is necessary only "if the sentence would have been different but for the district court's error").

guideline is 5 levels, departure would be warranted in the unusual case where the additional offenses resulted in a total of significantly more than 5 Units." USSG § 3D1.4, comment. (backg'd). It is a question of first impression in this circuit how many units are "significantly more than five." A survey of cases from other circuits shows how many units are significantly more than five, and how great of a departure they justify. See United States v. Wolfe, 309 F.3d 932, 935 (6th Cir. 2002) (ten units justified two-level upward departure); United States v. Szabo, 176 F.3d 930, 933 (7th Cir.) (nine units justified three-level upward departure), cert. denied, 528 U.S. 912 (1999); United States v. MacLeod, 80 F.3d 860, 865-66, 869 (3d Cir. 1996) (ten units justified two-level upward departure); United States v. Okane, 52 F.3d 828, 832-33 (10th Cir. 1995) (ten units justified one-level upward departure); United States v. Pearson, 911 F.2d 186, 189-90 (9th Cir. 1990) (eight units justified one-level upward departure); United States v. Chase, 894 F.2d 488, 491 (1st Cir. 1990) (fifteen units justified five-level upward departure).

We have no difficulty concluding that Courtney's offenses of conviction, combined with his other admitted relevant conduct offenses, resulted in significantly more than five units.[3] Nor do we have any difficulty concluding that the need to provide incremental punishment for these additional units, viewed alone or in conjunction with the other basis for departure discussed below in section III of this opinion, fully justified the district court's three-level upward departure.

---

[3] Because the eight victims identified in the indictment were used to enhance Courtney's offense level under USSG § 3A1.1(b)(2) (large number of vulnerable victims), he argues that it would be impermissible double-counting to use the units resulting from the offenses against those victims as the basis for an upward departure under USSG § 3D1.4. We may assume without deciding that Courtney is correct because, regardless of whether it was thirty-four units or twenty-six units that went unpunished, we would conclude that either number was significantly more than five units and justified a three-level upward departure.

Another reason the district court departed upward was to account for the extreme psychological harm caused by Courtney's conduct. The district court correctly cited the provision of the Guidelines specifically authorizing such a departure: "The base offense level [for tampering with consumer products] reflects that this offense typically poses a risk of death or serious bodily injury to one or more victims; or causes, or is intended to cause, bodily injury. Where the offense . . . caused extreme psychological injury . . ., an upward departure may be warranted." USSG § 2N1.1, comment. (n.1). The district court accurately noted that Courtney's offense level had been enhanced under USSG § 2N1.1(b)(1)(A) only for causing life-threatening *bodily* injury, such that it would not be double-counting to depart upward on the basis of extreme *psychological* injury. The district court explained:

> Cancer patients understandably suffer from a high degree of anxiety and stress as their lives hang in the balance. Often, their sole hope for survival--not necessarily recovery, but mere survival--depends upon these drugs. The hope is an uncertain one, as there is often no guarantee whether or to what extent the drugs will prove effective in a given case. Early treatment is, as is the case with many diseases, instrumental in determining the ultimate success--and now these patients have learned that they effectively had no treatment whatsoever. Their anxiety and stress has been compounded to a degree beyond any possible comprehension: those still living face not only the uncertainty presented by their illness, but the uncertainty as to "what might have been" had Defendant not engaged in criminal conduct--whether they might feel better or live longer, or whether their prognosis would be better had they received the intended medication.

United States v. Courtney, 240 F. Supp. 2d 1052, 1054 (2002).

We agree. The unobjected-to portions of the presentence report are replete with victim-impact statements that illustrate the extreme psychological harm suffered

by Courtney's direct victims. A woman who received four diluted chemotherapy doses wrote, "Being diagnosed with ovarian cancer and dealing with the fact that you may not be around to see your kids grow up [is hard enough] without having to deal with someone doing this to you. The fear alone is indescribable. You wonder[,] if you would have gotten the medication you were supposed to have[,] if your cancer would have come back or not." Another woman in the same position wrote, "I have suffered worry, stress[,] and extreme anxiety concerning the recurrence of the disease after the initial period. Would the disease have 'come back' if the initial treatments had been full dosage? We'll <u>never</u> know! I have felt intense <u>anger</u> and related stress from the knowledge of Courtney's deliberate wrong doing directly related to me. Will I be able to conquer this disease or have his actions reduced my odds in any fashion[?] Will my life be shortened by this crime?" A female victim who received seven diluted chemotherapy doses wrote, "Emotionally, it has affected me the most. It is a very hard thing to deal with. I lose my self control and cry when I think of Courtney – how he would take someone's life for money." A woman who received two diluted chemotherapy doses wrote, "Lots of sleepless nights. Lots of stress not knowing what [w]as done to my body. If Gemzar had been a regular chemo (not diluted)[,] I wouldn't have pancreatic cancer on my liver now."

A female victim who received seven diluted chemotherapy doses wrote, "This crime takes hope away that the treatment was effective and has created doubt. I feel like I have lost peace of mind because I worry about future occurrences of cancer and if I will receive the correct dosing of medicine." Another female patient wrote, "When I was diagnosed with cancer, I discovered I had to fight an emotional battle as well as a physical one. During this time, I tried to accept that I had a very dangerous set of cells invading my body. Early last fall, I discovered I had another force invading my body. This was one I hadn't counted on. I had to face the reality that someone had purposely diluted the drugs going through my body. I have no idea how it affected my disease, but I felt violated – I felt raped."

9

A woman who received six diluted doses wrote, "I saw [the doctor] in February of 2001 and began chemo treatments of Taxol and Carboplatin immediately. Because I had responded favorably to these two chemo drugs previously, it was only natural to expect the same response. Unfortunately my health worsened and in March I had to resign from my position [at work]. [The doctor] decided to try a different treatment using Gemzar, but it still didn't improve my situation at all. It wasn't until August of 2001 when I was told I had received diluted chemo drugs from Mr. Courtney's pharmacy that it all made sense why my health was failing. I feel as though my family has been short changed. I feel my whole future has been taken away from me." These are only some excerpts from the numerous victim-impact statements provided by the direct victims of Courtney's chemotherapy-dilution crimes.

Since this circuit has not previously considered an upward departure under USSG § 2N1.1, comment. (n.1), we have reviewed our cases dealing with other Guidelines provisions authorizing upward departures for extreme psychological injury. See, e.g., United States v. Thin Elk, 321 F.3d 704 (8th Cir. 2003); United States v. Rose, 315 F.3d 956 (8th Cir.), cert. denied, 123 S. Ct. 2238 (2003); United States v. Hampton, 260 F.3d 832 (8th Cir. 2001), cert. denied, 535 U.S. 1058 (2002); United States v. Lewis, 235 F.3d 394 (8th Cir. 2000); United States v. Sample, 213 F.3d 1029 (8th Cir. 2000); United States v. Otto, 64 F.3d 367 (8th Cir. 1995), cert. denied, 516 U.S. 1133 (1996); United States v. Yellow, 18 F.3d 1438 (8th Cir. 1994). Having reviewed the facts and legal principles discussed in those cases, we are satisfied that in sentencing Courtney, the district court did not err by departing upward on the basis of the extreme psychological harm his victims suffered. We are further satisfied that this ground for departure, viewed alone or in conjunction with the other basis for departure discussed in section II of this opinion, justified the full extent of the district court's three-level departure. Finally, we reject Courtney's argument that the district court engaged in impermissible double-counting by enhancing his offense level on the basis that the victims were vulnerable and by departing upward on the basis that the victims suffered extreme psychological injury;

10

these Guidelines provisions account for different kinds of harm. <u>See generally</u> <u>United States v. Fortney</u>, 357 F.3d 818, 821-22 (8th Cir. 2004) (defining double-counting).

IV.

Accordingly, we affirm the judgment of the district court.

_____