Vincent **FERRARA**

v.

**UNITED STATES of America**

No. Civ.00–11693–MLW.

United States District Court, D. Massachusetts.

May 13, 2005.

David Z. Chesnoff, Goodman & Chesnoff, Las Vegas, NV, David A. Nickerson, San Rafael, CA, Martin G. Weinberg, Oteri, Weinberg & Lawson, Boston, MA, for Vincent M. Ferrara.

James F. Lang, Robert E. Richardson, United States Attorney's Office, Boston, MA, for United States of America.

*MEMORANDUM AND ORDER CONCERNING RESENTENCING*

WOLF, District Judge.

## I. SUMMARY

As described in the April 12, 2005 Memorandum and Order, petitioner Vincent Ferrara has proven that he was denied Due Process when the government violated its clearly established constitutional duty to disclose to Ferrara, before trial, important exculpatory information that directly negated his guilt on charges that Ferrara had directed his codefendant Pasquale Barone to murder Vincent James Limoli. *See Ferrara v. United States*, 2005 WL 903196 (D.Mass., April 12, 2005). This Memorandum should be read in the context of that decision.

In summary, the government did not disclose that Walter Jordan, the only source of direct evidence on the Limoli murder charges, had told the government at least twice that Barone told him that Ferrara had *not* ordered the Limoli murder. Nor did it disclose the handwritten memorandum of Boston Police Detective Martin Coleman memorializing these statements by Jordan to lead prosecutor Jeffrey Auerhahn and Coleman. Instead, the government represented that Jordan would testify that Barone claimed that Ferrara had ordered Barone to kill Limoli. Fearing what he asserts would have been a wrongful conviction that would have resulted in a life sentence, Ferrara entered into a binding plea agreement providing for a twenty-two year sentence, as part of a series of linked, binding plea agreements by members of the Patriarca Family of La Cosa Nostra (the "LCN") which provided important benefits to the government. *See United States v. Carrozza*, 807 F.Supp. 156, 161 (D.Mass.1992).

As the court wrote in the April 12, 2005 Memorandum and Order:

The government's failure to disclose Jordan's statements that Ferrara had not ordered the Limoli murder utterly undermines the court's confidence in the outcome of Ferrara's case. The court now seriously doubts that Ferrara ordered Barone to kill Limoli. In any event, if the required disclosures concerning Jordan's statements had been made, there is a reasonable probability that Ferrara would not have pled guilty to the Limoli murder charges, would not have been convicted of them or of any other racketeering act involving murder, and would not have been held responsi-

ble for any murders at sentencing. In view of the compelling reasons for the linked, binding plea agreements providing for downward departures for Ferrara and his codefendants, there is also a reasonable probability that the government and Ferrara would have resolved his case by agreeing to a sentence of much less than twenty-two years if the required disclosures concerning Jordan had been made. Therefore, Ferrara is entitled to appropriate, equitable relief. *Ferrara*, 2005 WL 903196 at *3. The parties agree that, at this time, the only feasible remedy is to resentence Ferrara. They disagree on what the corrected sentence should be.

The court's equitable power to devise a remedy for the violation of Ferrara's constitutional rights is broad and flexible. The court's goal is to fashion a remedy that will, as much as possible, place Ferrara in the position that he would have been in if the government had not violated his constitutional right to Due Process. As part of that effort, the court must consider the advisory Guidelines range for Ferrara's sentence and the statutory sentencing factors set forth in 18 U.S.C. § 3553(a) as well.

In the April 12, 2005 Memorandum and Order, the court addressed the major resentencing issues that had been raised in connection with the April 1, 2004 hearing in this case and indicated that Ferrara appeared to be entitled to be resentenced to time-served. The government responded to the April 12, 2005 Memorandum and Order by raising a myriad of additional sentencing issues that it could and should have presented previously. Nevertheless, on May 3, 2005, the court conducted a six-hour resentencing hearing and has, in this

Memorandum, addressed all of the issues presented.

As described below, Ferrara, who has earned all available "good time" credits, has been incarcerated for almost sixteen years. This is the equivalent of the time he would have served if he had been sentenced in 1992 to 213 months, or almost eighteen years in prison. However, as now properly calculated, the Guidelines range for his sentence is 151–188 months, or about twelve to sixteen years.[1] Therefore, the court concludes that the government's unconstitutional conduct has caused Ferrara to serve several more years in prison than the advisory Guidelines contemplate.

The § 3553(a) factors do not support a sentence greater than time-served. Indeed, they indicate that even if a sentence of time-served, 213 months, were not above or within the Guidelines range, it would be the most reasonable and appropriate sentence to impose.

Ferrara will, therefore, be resentenced to time-served.

## II. THE LEGAL FRAMEWORK FOR FERRARA'S RESENTENCING

As this case is in an unusual procedural posture, it is important to recognize the legal standards that are now applicable.

Resentencing, or correction of Ferrara's original sentence, is the remedy that the court has ordered, pursuant to 28 U.S.C. § 2255, for the government's violation of Ferrara's constitutional right to Due Process. *See Ferrara*, 2005 WL 903196 at *47–54. Section 2255 directs that where, as here, the prisoner has proven that his constitutional rights have been violated,

---

1. The court has in this Memorandum also done certain alternative Guidelines calculations. All of them indicate that a sentence of time-served is within or above the Guidelines range.

"the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."

The First Circuit has emphasized:

the broad leeway traditionally afforded district courts in the exercise of their § 2255 authority. "The § 2255 remedy is broad and flexible, and entrusts to the courts the power to fashion an appropriate remedy." *United States v. Garcia,* 956 F.2d 41, 45 (4th Cir.1992) (citing *Andrews v. United States,* 373 U.S. 334, 339, 83 S.Ct. 1236, 10 L.Ed.2d 383 (1963)). This is so because a district court's power under § 2255 "is derived from the equitable nature of habeas corpus relief." *United States v. Handa,* 122 F.3d 690, 691 (9th Cir.1997) (internal citations omitted); *see also Schlup v. Delo,* 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("[H]abeas cor-

pus is, at its core, an equitable remedy.").
*United States v. Torres–Otero,* 232 F.3d 24, 30 (1st Cir.2000).

■ While the court's discretion to devise an equitable remedy is considerable, "the remedy 'should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.'" *United States v. Gordon,* 156 F.3d 376, 381 (2d Cir.1998) (quoting *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)).[2] A remedy tailored to the constitutional violation is "one that as much as possible restores [Ferrara] to the circumstances that would have existed had there been no constitutional error." *United States v. Carmichael,* 216 F.3d 224, 227 (2d Cir.2000). *See also Gordon,* 156 F.3d at 381.

■ As argued by the government, *see* Apr. 1, 2004 Tr. at 108,[3] and explained in

---

2. Tailoring the remedy to the injury suffered by Ferrara means, in part, not rewarding him, or punishing the public, for the government misconduct in this case. As this court stated in 1982, while serving as the Acting United States Attorney for the District of Massachusetts:

> Certainly, there are remedies focused on prosecutors as lawyers if they have violated their ethical duties, and that is really the way these things should work when one represents the public. The client ought not to be penalized, the citizens of the Commonwealth, [for] this ethical violation because [the alleged misconduct] is an ethical violation as well as a constitutional issue. There are remedies that can focus on the lawyer. In this case, the lawyer is a prosecutor.

*United States v. Kelly,* 543 F.Supp. 1303, 1313 (D.Mass.1982). *But see United States v. Leung,* 351 F.Supp.2d 992, 995 (C.D.Cal., 2005), *quoting United States v. Kojayan,* 8 F.3d 1315, 1318 (9th Cir.1993) (" 'In determining the proper remedy [for prosecutorial misconduct], we must consider the government's wilfulness in committing the misconduct and its willingness to own up to it.' ").

3. On April 1, 2004, Assistant United States Attorney James Lang stated that:

> if the basis of the relief were to be a finding by your honor that had disclosure [of the Coleman memorandum] been made, Mr. Ferrara would have balked at pleading to the Limoli charges and would have negotiated some more favorable deal ... I would suggest that the appropriate remedy would be to vacate counts 3 and 4 [concerning the Limoli murder] and the admissions as to racketeering act A–3 [concerning the Limoli murder]. Recognizing the case law, I would suggest that [ ] a sentencing bundle can be undone when certain counts are vacated, leading to a resentencing ... and the government would be in the position of arguing, as it has in its brief, that you should very much consider and credit the information indicating Mr. Ferrara's involvement in the DiFronzo–Corlito killings and find that there was a life sentence Guideline sentencing range on a resentencing ... [W]e'd be focusing on DiFronzo and Corlito [not Limoli] at that point.

Apr. 1, 2004 Tr. at 108–09.

*Ferrara,* 2005 WL 903196 at *48, 53–54, in the circumstances of this case it is most appropriate to "unbundle" the sentencing package that resulted from Ferrara's unlawfully obtained plea agreement and resentence him or correct his sentence. *See United States v. Rodriguez,* 112 F.3d 26, 29–30 (1st Cir.1997); *Handa,* 122 F.3d at 692. "After the unbundling the district court is free to put together a new package reflecting its considered judgment as to the punishment the defendant deserves for the crimes of which he is still convicted." *Handa,* 122 F.3d at 692. *See also Rodriguez,* 112 F.3d at 30 ("the sentencing judge[ ] is in the best position to . . . redefine the package's size and shape.").

██ In addition, as the parties recognize, this resentencing is governed by the law as it now exists after the Supreme Court's decision in *United States v. Booker,* —— U.S. ——, ·125 S.Ct. 738, 160 L.Ed.2d 621 (2005). *See Ferrara,* 2005 WL 903196 at *49. The Sentencing Guidelines are, therefore, advisory. *Booker,* 125 S.Ct. at 757. The court must consider the Guidelines range but is permitted "to tailor the sentence in light of other statutory concerns as well, *see* § 3553(a) (Supp. 2004)." *Id.*

This means that normally the court should calculate the Guidelines range. *See United States v. Crosby,* 397 F.3d 103, 113 (2d Cir.2005); *United States v. Mares,* 402 F.3d 511, 518 (5th Cir.2005); *United States v. Haack,* 403 F.3d 997, 1002–03 (8th Cir. 2005).

> In one circumstance, however, precise calculation of the applicable Guidelines range may not be necessary. Now that the duty to apply the applicable Guidelines range is not mandatory, situations may arise where either of two Guide-

lines ranges, whether or not adjacent; is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless ·of which of the two ranges applies. This leeway should be useful to sentencing judges in some cases to avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters . . .

*Crosby,* 397 F.3d at 112. *See also Haack,* 403 F.3d 997, 1002–03 ("We, like the Second Circuit, realize that there may be situations where sentencing factors may be so complex, or other § 3553(a) factors may so predominate, that determination of a precise sentencing range may not be necessary or practical.").[4]

Therefore, § 2255 provides this court broad leeway to fashion an appropriate equitable remedy for the government's violation of Ferrara's constitutional right to Due Process. *See Torres–Otero,* 232 F.3d at 30. The court is exercising that discretion to devise a remedy that "as much as possible restores [Ferrara] to the circumstances that would have existed had there been no constitutional error." *Carmichael,* 216 F.3d at 227. In doing so, the court is determining the correct, present Guidelines range and also considering the various possible Guidelines ranges and the § 3553(a) factors. As indicated earlier and described below, Ferrara has already served a longer sentence than would have been imposed in 1992 absent the government's misconduct. He has also served more time than would be imposed if this were an original sentencing hearing. The § 3553 factors do not justify a higher sentence. Rather, even if it were not a Guide-

---

4. At the May 3, 2005 hearing the parties agreed that the court has accurately described the applicable standards for devising a reme-

dy in this case pursuant to § 2255 and for the sentencing law after *Booker. See* May 3, 2005 Tr. at 16, 19–20.

lines sentence, they indicate that Ferrara should be resentenced to time-served. Therefore, it is reasonable and most appropriate to correct Ferrara's sentence and resentence him to time-served. *See* § 2255.

## III. THE PROCEDURAL HISTORY AND THE APRIL 12, 2005 DECISION

The April 12, 2005 Memorandum and Order describes the long procedural history of this case. *See Ferrara*, 2005 WL 903196 at \*18–20. In view of the government's belated arguments following that decision, some amplification is appropriate.

The September 2003 hearings on Barone and Ferrara's § 2255 petitions revealed that the government had improperly withheld from the prisoners the Coleman memorandum and the information it contained that directly negated their guilt on the Limoli murder charges on which Barone was convicted, and to which Ferrara had pled guilty but promptly proclaimed his innocence to the Probation Department, as reflected in his Presentence Report. The government entered into an agreement that Barone, who was serving a life sentence, should be released. Barone was resentenced and released in October 2003.

The government did not agree that Ferrara should be resentenced and released. Rather, it asserted that his plea of guilty to the Limoli murder charges deprived him of any right to relief. Beginning in September 2003, this court was conducting the trial of the capital case that resulted in a death sentence being imposed on Gary Sampson on January 29, 2004.

In February 2004, proceedings resumed in Ferrara's case. After a hearing on February 11, 2004, as suggested by Ferrara, the court decided to bifurcate his claims, resolve those relating to the Limoli murder, and address later if necessary his claims arising out of the government's misrepresentations concerning his unsuccessful 1991 motion to suppress the electronically intercepted evidence of the 1989 La Cosa Nostra ("LCN") induction ceremony, based upon the related revelations of government misconduct in *United States v. Salemme*, 91 F.Supp.2d 141, 269–89 (D.Mass.1999).

Among other things, the court ordered the government to identify all of the evidence that it would rely upon concerning the murders of Giacomo DiFronzo and Anthony Corlito, which were alleged racketeering acts to which Ferrara had not pled guilty. *See* Feb. 11, 2004 Tr. at 41; Feb. 11, 2004 Order (Docket No. 138). The government asked the court to reconsider and find that Ferrara's responsibility for the DiFronzo and Corlito murders was established at his 1992 sentencing. *See* Gov. Notification Pursuant to Order of February 11, 2004 and Motion to Reconsider (Docket No. 140) at 6–8. The court denied that request. *See* Feb. 27, 2004 Order (Docket No. 142).

The government represented that with regard to DiFronzo and Corlito it would rely on identified portions of the testimony of Jordan and Elizabeth DiNunzio at the Barone trial. *See* Gov. Notification (Docket No. 140); Gov. Mem. Pursuant to Court Order of Feb. 11, 2004 (Docket No. 143); Gov. Supplemental Notification Pursuant to Court Order of Feb. 27, 2004 (Docket No. 144). In its Supplemental Notification, the government stated that it also wished to rely on other evidence "indirectly implicating" Ferrara in the DiFronzo and Corlito murders which was presented at Barone's trial. *See* Supp. Notification at 2.

The parties briefed the implications of the government's evidence concerning the DiFronzo and Corlito murders for both the merits of Ferrara's § 2255 petition and

any resentencing. *See* Ferrara Mem. Relating to Order of Feb. 11, 2004 (Docket No. 141); Gov. Mem. Pursuant to Court Order of Feb. 11, 2004 (Docket No. 143) at 59–71; Ferrara's Reply to Gov. Mem. (Docket No. 146). On April 1, 2004, the court conducted a hearing on the merits of Ferrara's petition and the remedy if it were granted.

As described earlier, *see* n. 2 *supra,* the government argued that if the petition was granted, Ferrara should be resentenced. *See* Apr. 1, 2004 Tr. at 108–09. More specifically, the court stated: "your argument would be there should be a resentencing, and I should then decide whether the government has proven by a preponderance of the evidence Limoli, DiFronzo, or Corlito" constitute relevant conduct. *Id.* at 109. Assistant United States Attorney Lang responded: "We'd be focusing on DiFronzo and Corlito." *Id.* at 109. The court asked if the government proposed having Jordan and DiNunzio testify at the resentencing and was told by Lang that the government would rely on the Barone trial record, as addressed in its briefs. *Id.* at 111. Lang explained:

> We are now upwards . . . of 19 years or something after the events they would be testifying about so I suggest it would serve no purpose to have Mr. Jordan and Ms. DiNunzio come in now and try to give us their present day recollections of exactly what Mr. Barone and Mr. Limoli said to them. The best record that we have of what they could relate to the court is what they testified to at the Barone trial. . . .

*Id.* at 113–14.

In the April 12, 2005 Memorandum and Order, the court granted Ferrara's § 2255

petition and also addressed the resentencing issues. As the court repeatedly wrote and explained, the court found that "the evidence is insufficient to hold Ferrara responsible for the Limoli murder, or any other murder, in calculating the advisory Guideline range for his sentence." *Ferrara,* 2005 WL 903196 at *3; *see also id.* at *13, 46, 47, 50, 50 n. 24, 51. More specifically, despite the government's representation that it would not rely on the Limoli murder at resentencing, the court analyzed the evidence concerning it and wrote that "the government cannot now prove the Limoli murder charges even under the preponderance of the evidence standard that may be applicable now that the Guidelines are advisory." *Id.* at *50; *see also id.* at *3 ("the court finds that the evidence is insufficient to hold Ferrara responsible for the Limoli murder, or any other murder, in calculating the advisory Guideline range for his sentence."); *Id.* at *13 ("the court is persuaded that the government would not have been able to prove fairly Ferrara's involvement in Limoli's murder even by a preponderance of the evidence"). As the court explained:

> Having grappled with issues relating to the Limoli homicide in the Barone trial and Patriarca sentencing, this court seriously doubts that Ferrara is actually guilty of the charges concerning it.[5] In any event, the court does not believe that the government could have fairly proved those charges, or the charges relating to the murders of DiFronzo and Corlito, either at trial or at sentencing.

*Id.* at *46.

With regard to DiFronzo and Corlito, the court noted that it would be unfair to

---

**5.** The court first analyzed issues relating to the Limoli murder in 1990 when the government wrongly asserted that Anthony "Spucky" Spagnolo, a member of the Patriarca Family of the LCN, participated in the Limoli killing. *See United States v. DiGiacomo,* 746 F.Supp. 1176, 1189 (D.Mass.1990); *United States v. Patriarca,* 912 F.Supp. 596, 623 (D.Mass.1995); *Ferrara,* 2005 WL 903196 at *4 n. 3.

Ferrara to decide that he was responsible for the murders based on the evidence at the Barone trial because he did not participate in that trial and neither Jordan nor DiNunzio was fully cross-examined by Barone's counsel because the government unlawfully suppressed the information in Coleman's memorandum. *Id.* at *50. Nevertheless, the court analyzed that evidence and wrote: "In any event, the court finds that the evidence presented at the Barone trial [which the court conducted for eleven weeks] is insufficient to prove even by a preponderance that Ferrara should be held responsible for the Corlito and DiFronzo murders." *Id.* at, *51; *see also id.* at *3, 13, 46, 47, 51. The court then wrote several pages explaining the reasons for that conclusion. *Id.* at *51. Accordingly, the court decided that it would "resentence Ferrara without regard to the impact that the Limoli, Corlito, or DiFronzo murders would have on the Guideline range." *Id.* at *51.

Based on the briefing and arguments previously presented, the court understood that there were two remaining issues to be resolved: whether Ferrara should be given a two-level downward adjustment for acceptance of responsibility and whether he should receive a four-level, rather than three-level, enhancement for his role in the extortion of Morris Weinstein. *Ferrara,* 2005 WL 903196 at *51–52.

Even if the government's positions with regard to acceptance of responsibility and Ferrara's role in the Weinstein extortion were correct, the Guidelines range for Ferrara's sentence would have been 210–262 months. *Id.* at *52. Ferrara has already served more time in prison than a 210–month sentence would have required. *Id.* The reasons that justified what was understood to be a downward departure from life to twenty-two years in prison suggested that no more than a 210–month sentence should be imposed at Ferrara's resentencing. Thus, the court scheduled what it expected would be a relatively brief resentencing hearing for May 3, 2005.

However, on April 27, 2005, the government filed a Sentencing Memorandum signed by Assistant United States Attorney James Herbert (Docket No. 171). Herbert was one of the three Assistant United States Attorneys who originally prosecuted Ferrara and his codefendants and, therefore, shared in the government's responsibility to produce the Coleman memorandum to Ferrara. *See Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).[6] The court had been told that Lang was selected to

---

**6.** There is no evidence that Herbert, or his colleague Gregg Sullivan, knew of the Coleman memorandum or the information that it contained. However, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437, 115 S.Ct. 1555. As the Supreme Court has repeatedly written, there is not "any serious doubt that 'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to *every* lawyer who deals with it.'" *Id.* at 438, 115 S.Ct. 1555 (quoting *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972))

(emphasis added). When Coleman testified in 2003 that he had written a memorandum memorializing Jordan's statement to him and Auerhahn that Barone reported that he had not obtained Ferrara's permission to murder Limoli, the government quickly found that memorandum in its files. "Auerhahn was, in late 1991 and 1992, well aware of Jordan's important recantation and intentionally did not disclose it to Ferrara." Apr. 12, 2005 Mem. at 24, n. 10; *Ferrara,* 2005 WL 903196 at *11 n. 10. Auerhahn's unlawful effort would not have succeeded, however, if Herbert and Sullivan had properly performed their constitutional duties. *See Kyles,* 514 U.S. at 437–38, 115 S.Ct. 1555.

represent the government after the United States Attorney's Office was informed by Durham of Jordan's allegations because Auerhahn and Herbert were potential witnesses. Affidavit of Michael J. Sullivan (Docket No. 135) at ¶ 3.[7] Herbert did provide evidence, in the form of an affidavit, in this case. However, after the court's April 12, 2005 decision, Herbert appeared on behalf of the government and in his Sentencing Memorandum sought to relitigate issues the court had decided and inject many new issues that could have been raised previously. Thus, on May 3, 2005, the resentencing hearing consumed about six hours.

## IV. ISSUES CONCERNING THE CALCULATION OF THE GUIDELINES RANGE

### A. *Limoli, DiFronzo, and Corlito*

■ Clearly mischaracterizing the April 12, 2005 Memorandum and Order, the Government's Sentencing Memorandum, at 2, states, "in light of the Court's decision not to rely on the evidence from the *Barone* trial regarding the Limoli, Corlito, and DiFronzo murders, the government hereby requests an evidentiary hearing to establish that even apart from Walter Jordan's testimony, there is ample evidence to prove Ferrara's responsibility for these murders for sentencing purposes." At the May 3, 2005 hearing, the court reiterated that it had considered the Barone trial evidence previously identified by the government and pointed out its express findings that the evidence presented at the Barone trial is insufficient to prove even by a preponderance that Ferrara should be held responsible for the Limoli, DiFronzo, or Corlito murders. Herbert then withdrew the request for an evidentiary hearing concerning them. *See* May 3, 2005 Tr. at 67.[8]

The government did request that the court consider a May 2, 2005 affidavit of Elizabeth DiNunzio that was filed and sealed just before the May 3, 2005 resentencing hearing began.[9] Recalling DiNunzio's testimony, it is evident to this court

---

7. In January 2003, Durham informed this court that he intended to disclose to Barone and Ferrara Jordan's allegations, and related information generated by his investigation. *See* Apr. 12, 2005 Mem. at 43–44. Affidavit of Michael J. Sullivan at ¶ 3; Affidavit of John Durham at ¶ 4 (Docket No. 120). The United States Attorney, Michael Sullivan, told Durham that because his office was representing the government, it would make the disclosures instead. Mem. at 44; Affidavit of Michael J. Sullivan at ¶ 3; Affidavit of John Durham at ¶ 4(d). Disclosure was initially delayed while Durham did additional investigation at Herbert's request. Affidavit of John Durham at ¶ 4(b). It was further delayed when the matter was transferred to Lang. On March 6, 2003, the court conducted a lengthy hearing on Ferrara and Barone's § 2255 petitions at which Jordan's allegations were not mentioned because, the court now knows, the disclosures Durham had promised in January had not been made. Nor were they ever made before Ferrara independently received information about Jordan's allegations and

moved for the disclosure of exculpatory evidence in April, 2003. The failure of the government to act promptly on Durham's representation to the court has contributed to the prolongation of Ferrara's improper imprisonment.

8. Herbert subsequently sought to have made part of the record a compact disc that he represented contains the Barone trial transcripts. This court was required to work with the paper transcripts. The record of this case in the District Court should consist only of materials that were available for the court's consideration before it decided particular issues. Therefore, the court did not make the compact disc part of the District Court record. It did note, however, that the First Circuit could decide whether to accept the compact disc for its own use. *See* May 3, 2005 Tr. at 67–9.

9. The DiNunzio affidavit (Docket No. 179) is hereby UNSEALED.

that the affidavit was written by an attorney. As described earlier, the government argued on April 1, 2004 that "it would serve no purpose to have Mr. Jordan and Ms. DiNunzio come in now and try to give us their present day recollections of exactly what Mr. Barone and Mr. Limoli said to them" nineteen or twenty years ago. Apr. 1, 2004 Tr. at 114–15. In view of the government's prior representation, on which the court relied, the court should ignore DiNunzio's affidavit. The court has, however, considered it and finds it to be immaterial.[10]

DiNunzio generally reaffirms her Barone trial testimony and asserts that it would not have changed if she had known of Jordan's recantation. The affidavit does not alter the court's analysis. As explained in the April 12, 2005 Memorandum, the government's case in *Barone* was weak and depended primarily on Jordan. Some of DiNunzio's testimony was admitted because it was corroborated by Jordan's testimony. Any assessment by the court of DiNunzio's credibility at the Barone trial was influenced by Jordan's testimony. Part of DiNunzio's testimony was found on appeal to have been improperly admitted, but the error was deemed harmless because of Jordan's testimony on the subjects. *See United States v. Barone*, 114 F.3d 1284, 1298, 1299 (1st Cir.1997). Jordan's credibility has essentially been destroyed. Even assuming, without finding, it to be reliable, "[t]he hearsay related by DiNunzio does not add enough to prove Ferrara's complicity in [the Corlito and DiFronzo murders] even by a preponderance of the evidence." *Ferrara*, 2005 WL 903196 at *51. DiNunzio's testimony is also not alone, or in combination with any other credible evidence, sufficient to prove

Ferrara's responsibility for the Limoli murder.

In its April 27, 2005 Sentencing Memorandum, the government requests that the court reconsider its ruling that the evidence is insufficient to permit Ferrara to be punished at resentencing for the Limoli murder. Having lost on this issue, the government for the first time in the long pendency of this case argues that the Limoli murder constitutes relevant conduct even if Ferrara did not authorize it, order it, or know about it.

The court recognizes that it has the discretion to reopen the issue of whether the Limoli murder should be included in the calculation of the Guidelines range for Ferrara's sentence and revise its ruling.

> Reconsideration, however, is not provided indiscriminately whenever some party might wish it. Judges must protect themselves and other parties against the delays and burdens that could be imposed by yielding to simple desire to inflict delay and burden.

18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478 at 720 (2002 ed.).

The present issue is comparable to the government's belated contention that Ferrara's § 2255 claim is barred by the doctrine of *Teague v. Lane*, 489 U.S. 288, 299–300, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). That issue was not raised in any of the government's briefs until after the court took the matter under advisement on April 1, 2004. *See Ferrara*, 2005 WL 903196 at *24–25. The government acknowledged that it had "'abundant opportunities to raise its *Teague* claim well before it did.'" *Id.* at *25 (quoting Gov. Mem. Pursuant to Court Order of April 9,

---

**10.** If DiNunzio's affidavit were material, the court would provide Ferrara an opportunity to cross-examine her.

2004). The court found that the *Teague* claim had been waived, in part because:

To permit a belated *Teague* defense in these circumstances would encourage the government to believe that when it has reason to foresee defeat it can keep a petitioner incarcerated and a court preoccupied by repeatedly raising a succession of defenses. This result is not in the interest of the administration of justice. *See Knox*, 2004 WL 442629 at *3 (denying a belated request to present a *Teague* defense because the government "did not mention *Teague* until after the Court had ruled that [certain] claims would not be dismissed. Were the Court to allow the government to raise the issue now, we would effectively be saying that the parties' briefs on a contested matter are merely a dry run, with a second go-around after they see what works and what does not work.")

*Id.* at *25.

The reasons for deeming the government's new relevant conduct claim waived are even more compelling. It does not depend on the discovery of new evidence, an intervening change in the law or a clear error in the court's earlier ruling. *See, e.g., Davis v. Lehane*, 89 F.Supp.2d 142, 147 (D.Mass.2000); *McCoy v. Macon Water Authority*, 966 F.Supp. 1209, 1222–23 (M.D.Ga.1997). Although it depends on purported facts and theories entirely different from those the government has advocated since 1990 in the *Spagnolo, Ferrara, Patriarca*, and *Barone* cases, it could have been raised and briefed before the April 1, 2004 hearing.

■ Moreover, on the present record the court is not persuaded that the murder of Limoli constitutes relevant conduct on the government's newest theory. "[R]elevant conduct in a RICO case includes all conduct reasonably foreseeable to the particular defendant in furtherance of the RICO enterprise to which he belongs." *United States v. Carrozza*, 4 F.3d 70, 74–5 (1st Cir.1993); *see also United States v. Patriarca*, 912 F.Supp. 596, 604–08 (D.Mass.1995). The RICO enterprise charged in this case is the Patriarca Family of the LCN and included the Boss, Raymond J. Patriarca. At the time of the Limoli murder, the Enterprise had a rule that prohibited members from selling drugs and another rule that prohibited murder without approval of the Boss. *See Patriarca*, 912 F.Supp. at 612–613. Ferrara may have known that Barone and Limoli, who were not members of the Family, were violating the prohibition on drug dealing. *Id.* at 624. However, if, as it now appears, Limoli was killed as a result of a drug dispute with Barone, it is not proven that this murder was in furtherance of Ferrara's RICO conspiracy with Patriarca and others, including Barone, or as a reasonably foreseeable consequence of that conspiracy. It is, therefore, not relevant conduct in this case.

### B. *Ferrara's Role in the Weinstein Extortion*

■ The Presentence Report ("PSR") recommended that Ferrara receive a three-level enhancement, pursuant to § 3B1.1, for being a manager or supervisor (but not an organizer or leader) of criminal activity involving five or more participants. The government objected that the enhancement should be four levels because Ferrara was a leader. The court did not resolve this objection at the April 29, 1992 sentencing hearing. It is appropriate to do so now.

The government's objection is not meritorious. The court recognizes that "there can be more than one person who qualifies as an organizer or leader ···..." U.S.S.G.

§ 3B1.1 (1987),[11] Commentary. However, the government has not proven by a preponderance of the evidence that Ferrara was an organizer or leader in the Weinstein extortion.

Ferrara was a member of a dissident faction of the Patriarca Family. The dominant and most dangerous member of that faction was Joseph Russo, the Consigliere who became an LCN legend when he murdered FBI informant Joseph Barboza—a crime for which he was sentenced as one of Ferrara's codefendants. *See Carrozza,* 807 F.Supp. at 158–59; *Salemme,* 91 F.Supp.2d at 151. Ferrara and another codefendant, Robert Carrozza, were Capos of the Patriarca Family. The court recognizes, however, that their titles are not controlling. § 3B1.1, Application Note 3.

The Weinstein extortion involved six participants: Russo, Ferrara, Carrozza, Dennis Lepore, Angelo "Sonny" Mercurio, and Domenic Isabella. Russo was not present when the extortionate demand was made, but it became evident to the court during the two years of pretrial proceedings in his case that Ferrara and his colleagues regularly took direction from him.

The electronic surveillance captured the five participants other than Russo discussing the extortion and deciding to demand $500,000. Each of them and Russo received an equal share of the proceeds. Lepore and Ferrara played similar roles. In the electronically surveilled discussion after the extortion generated $250,000, Ferrara gave Lepore credit for persuading him and the other participants to try to extort $500,000, rather than a lesser amount, and for telling Ferrara "how to do it" before Ferrara "carried out the play." PSR at 24–25.

In the circumstances, the court is not persuaded that Ferrara was a leader or organizer of the Weinstein extortion. Indeed, even the three-level enhancement that he is being given may be excessive.

## C. The Grasso Murder

In its April 27, 2005 Sentencing Memorandum, the government contends for the first time in these proceedings that the murder of Underboss William Grasso constitutes relevant conduct for Ferrara's RICO offense and that his Guidelines range is, therefore, life in prison. The Probation Department did not treat the Grasso murder as relevant conduct in the PSR. The government did not object to its failure to do so.

The claim that the court should now consider the Grasso murder is inconsistent with the government's prior briefing, and its arguments at the April 1, 2004 hearing that if Ferrara's petition were granted, the court should focus on the Corlito and DiFronzo murders. There was good reason that Lang did not contend that the court should consider the Grasso murder as possible relevant conduct.

Ferrara's plea agreement provided Ferrara "immunity from federal prosecution for the Grasso murder." Gov. Sentencing Mem. at 4; *see also* PSR at ¶ (J)(h). The codefendants on trial with Ferrara, including Russo, the Consigliere, and Carrozza, another Capo, were also given immunity concerning the Grasso killing.[12]

---

11. As agreed by the parties, the court is now using the 1987 Guidelines as amended in 1988, which is the version of the Guidelines that was used in the 1992 sentencing.

12. The government also did not seek to hold Mercurio responsible for the Grasso murder, and the apparently related shooting of Francis Salemme. An informant told the FBI that Mercurio was fomenting violence against Grasso and Salemme. *See Salemme,* 91 F.Supp.2d at 268. Mercurio was then an FBI informant. *Id.* at 263–69. Shortly before Mercurio's indictment in Ferrara's case, the

As described earlier, the government's violation of Ferrara's constitutional right to Due Process requires the court to fashion an "appropriate, equitable remedy." *Torres–Otero*, 232 F.3d at 30. It should be a remedy that "as much as possible restores [Ferrara] to the circumstances that would have existed had there been no constitutional error." *Carmichael*, 216 F.3d at 227. It would certainly be inequitable, if not unlawful, for the court to find that Ferrara has lost the immunity provided in his plea agreement because the government violated his constitutional rights, particularly after the government has received all of the benefits of its bargain with Ferrara and his codefendants. Removing Ferrara's immunity would also be incompatible with the goal of restoring him to the situation that would have existed in the absence of the government's misconduct. The government agreed to give Carrozza, a Capo whose Guidelines range was not life in prison, immunity for the Grasso murder. If the government had fulfilled its constitutional duty to Ferrara, he would not have been punished for the Limoli, Corlito, or DiFronzo murders and, like Russo and Carrozza, would have received immunity for any possible responsibility he may have had for the Grasso killing as well.

Moreover, even if the court could lawfully and equitably consider the Grasso murder in redetermining Ferrara's sentencing, it would be unreasonable to do so. As indicated earlier, under the advisory Guidelines system the court must consider the § 3553(a) statutory factors in fashioning a sentence. *See Booker*, 125 S.Ct. at 757. Section 3553(a)(6) provides that the court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Thus, since *Booker* it has been held that sentencing judges are "no longer prohibited from considering the disparity between codefendants in fashioning a reasonable sentence." *United States v. Hensley*, 363 F.Supp.2d 843, 844–45 (W.D.Va.2005); *see also United States v. Revock*, 353 F.Supp.2d 127, 129 (D.Me.2005); *Simon v. United States*, 361 F.Supp.2d 35, 49 (E.D.N.Y.2005). In *United States v. Schneiderhan*, 404 F.3d 73 83–84 (1st Cir. 2005), the First Circuit was presented with a post-*Booker* argument based on alleged unwarranted disparity between codefendants and did not deem it to be unmeritorious as a matter of law. Rather, the First Circuit stated that "we think it evident that the district court would not have reduced defendant's sentence for the purpose of eliminating disparity." *Id.*

If, contrary to this court's conclusion, the Grasso murder could be considered as possible relevant conduct despite Ferrara's immunity, a lengthy proceeding would be required to decide the necessary facts. A trial in Connecticut concerning the Grasso murder took many weeks. The government's proffer indicates that it would rely on the testimony of John Castagna and Jack Johns.[13] Neither witness claims to have spoken with Ferrara or any of his codefendants prior to the Grasso murder. They reportedly say that they did meet with Russo, Carrozza, and Ferrara after participating in it and spoke particularly to Russo about it. Neither Ferrara, Russo,

---

FBI prompted him to flee and did not try to apprehend him. *Id.* at 292. When Mercurio was arrested on state drug charges in Georgia, the government did not seek to hold him responsible for the Grasso and Salemme shootings. Rather, it entered into a binding plea agreement that provided for a downward departure and no additional time in prison for his federal crimes. *Id.* at 293.

13. The proffer (Docket No. 184) is hereby UNSEALED.

nor Carrozza was charged in the Grasso murder case. It would be challenging, as well as time-consuming, for the government to prove Ferrara's responsibility for that crime if it was now entitled to an opportunity to do so. However, it is not.

### D. *Ferrara's Role in the RICO Enterprise*

■ In its April 27, 2005 Sentencing Memorandum, the government contends that the Probation Department erred by applying a role adjustment only with respect to Ferrara's underlying racketeering acts to calculate his Base Offense Level and not applying an additional adjustment for his role in the overall enterprise, the Patriarca Family, as well. The government did not make this objection to Ferrara's PSR in 1992. Nor did it make a similar objection to the Probation Department's failure to provide a second adjustment for role for Patriarca (the Boss), Russo (the Consigliere), and Carrozza (another Capo), who were codefendants of Ferrara, or for Biagio DiGiacomo (a Capo) in another Patriarca Family case before this court. Indeed, it appears that the government has never made this argument in any RICO case in this district.

Therefore, once again, applying a second role adjustment to the calculation of Ferrara's Guidelines range at resentencing would not "restore him to the circumstances that would have existed had there been no constitutional error." *Carmichael*, 216 F.3d at 227. Doing so would also be incompatible with the § 3553(a)(6) principle of "avoid[ing] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See Hensley*, at 844–45; *Revock*, 353 F.Supp.2d at 129; *Simon*, at 49–50; *Schneiderhan*, 404 F.3d 73, 83–84. Therefore, it is not reasonable at resentencing to add an additional enhancement for Ferrara's overall role in the Patriarca Family.

If this were an initial sentence, rather than a resentencing pursuant to § 2255, this court might find that it was legally permissible to apply an appropriate additional enhancement for Ferrara's role in the Patriarca Family. *See United States v. Damico*, 99 F.3d 1431, 1437 (7th Cir. 1996); *United States v. Yeager*, 210 F.3d 1315, 1317 (11th Cir.2000); *United States v. Coon*, 187 F.3d 888, 899 (8th Cir.1999). This conclusion is qualified because the defendant argues that to do so, in this case at least, would involve impermissible double counting, but he has not had an opportunity to brief the issue.

This issue is not, however, material to the corrected sentence to be imposed in this § 2255 resentencing. If an enhancement for Ferrara's role in the RICO enterprise, the Patriarca Family, were made, it would be a three-level adjustment for being a manager or supervisor, rather than a four-level adjustment for being an organizer and leader. As described earlier, even within the dissident Boston faction, Russo was the leader and Ferrara, among others, was his subordinate, middle manager. Ferrara was also a supervisor or manager, rather than a leader or organizer, of the much vaster Patriarca Family, the enterprise involved in this case.

Moreover, as explained below, even if Ferrara is given a three-level enhancement for his role in the RICO enterprise, a sentence of time-served would be the most appropriate Guidelines sentence. In addition, if it were not a Guidelines sentence, time-served would nevertheless be the most reasonable sentence in the circumstances of this case.

### E. *The Requested § 3D1.4 Upward Departure*

■ The government now asserts that the court should depart upward pursuant

to § 3D1.4 because the PSR found that he had eleven units, but only five were counted to calculate Ferrara's Offense Level. Once again, this argument was not made at Ferrara's sentencing in 1992. Nor was it made with regard to his codefendant Carrozza, who had 11 and one-half units, *see* Exhibit 1, and a Guidelines range of less than life.

The Commentary to § 3D1.4 states that, "[i]nasmuch as the maximum increase provided in the guidelines is 5 levels, departure would be warranted in the unusual case where the additional offenses resulted in a total of significantly more than 5 Units." 1987 United States Sentencing Commission Guidelines Manual. The court assumes that it has the discretion to deem eleven units to be significantly more than five units and depart. *See United States v. Courtney,* 362 F.3d 497, 501–02 (8th Cir.2004) (citing cases). It is not, however, necessary or appropriate to do so in this case.

Section 3553(b) generally authorizes departures for unusual circumstances "that should result in a sentence different than that described." As discussed below, Ferrara has already served the equivalent of a sentence of about eighteen years. That is a sentence which is "sufficient but not greater than necessary" to comply with the purposes set forth in § 3553(a)(2). *See* § 3553(a). As discussed below, to aggravate Ferrara's punishment at resentencing by departing pursuant to § 3D1.4 would impose a sentence that is greater than necessary to provide sufficient punishment. It would also be incompatible with the goal of restoring him, as much as possible, to the circumstances that would have existed if the government had not deprived him of Due Process. *See Carmichael,* 216 F.3d at 227. In addition, it would create unwarranted disparity between Ferrara and his codefendant Car-

rozza, among others. *See Hensley,* at 844–45; *Revock,* 353 F.Supp.2d at 129; *Simon,* at 49–50; *Schneiderhan,* 404 F.3d 73, 83–84. Therefore, the court has decided not to exercise its discretion to depart upward pursuant to § 3D1.4.

F. *Issues Relating to Criminal History*

In its April 27, 2005 Sentencing Memorandum the government, again for the first time, argues that the court should, pursuant to § 4A1.3(a)(1), depart upward and raise Ferrara's Criminal History category to VI, because the category III provided in the Presentence Report, without objection, under-represents the seriousness of his criminal history and the likelihood that he will commit further crimes. The government identifies no particular alleged conduct to support this belated argument. *See* May 3, 2005 Tr. at 106.

Ferrara contends that the court should not now consider issues that were not raised in 1992 as objections to the Presentence Report, but that if it does his Criminal History category should be reduced to I. In support of this argument, Ferrara asserts that the Probation Department, without objection in 1992, deemed his 1979 conviction for unlawful possession of a firearm as a prior offense when it should have been deemed "conduct that is part of the instant offense" to which Ferrara pled guilty and not used to raise his Criminal History category from I to III. § 4A1.2(a).

The court finds that it is most appropriate to continue to treat Ferrara as in Criminal History category III. Among other things, doing so is consistent with the goal of restoring Ferrara to the circumstances that would have existed in 1992 if the government had not violated Ferrara's constitutional rights. *See Carmichael,* 216 F.3d at 227.

As indicated earlier, Ferrara did not object in 1992 to the counting of his 1979 conviction as a prior sentence. Section § 4A1.2(a) (1988) defined a "prior sentence" as one that was imposed "for conduct not part of the instant offense." Similarly, Application Note 1 stated, " 'Prior sentence' means a sentence imposed prior to sentencing on the instant offense, other than a sentence for conduct that is part of the instant offense." Until April 27, 2005, the government consistently contended that a member of the Patriarca Family could not commit a crime without the permission of his superior. Ferrara was charged with being part of the Patriarca Family RICO conspiracy from at least 1975 and, therefore, with being a member of it in 1979 when he was convicted of unlawful possession of a firearm. *See* PSR at ¶ 42. Thus, on the government's long-standing theory, Ferrara's unlawful possession of a firearm, which was not charged as a racketeering act in this case, apparently should be deemed part of the "instant offense," Ferrara's RICO conspiracy. *But see United States v. Marrone,* 48 F.3d 735, 737 (3rd Cir.1995) (conduct charged as part of a pattern of racketeering activity that was subject to an earlier conviction and sentence should be treated as a prior sentence and not as part of the instant offense). If Ferrara is correct, his Criminal History category would be I.

Two of Ferrara's codefendants, Russo and Lepore, were also in Criminal History category I. *See* Apr. 29, 1992 Tr. at 19, 23. Although Russo had pled guilty to murdering Barboza, and was believed to have killed others, the government did not ask the court to depart upward on his Criminal History category in initially agreeing to a fifteen-year sentence and then to a sixteen-year sentence for Russo. *See Carrozza,* 807 F.Supp. at 157 n. 2. Thus, departing upward for Ferrara from category I, let alone III, would involve the sort of unwarranted disparity § 3553(a)(6) seeks to avoid. *See Hensley,* at 844–45; *Revock,* 353 F.Supp.2d at 129; *Simon,* at 49; *Schneiderhan,* 404 F.3d 73, 83–84.

In any event, there is not a proper factual basis to depart upward from Criminal History category III. The evidence does not establish any of the particular circumstances that the 1988 Guidelines Manual indicated might justify an upward departure, under § 4A1.3, on the basis that Ferrara's Criminal History category significantly under-represents the seriousness of his criminal history.[14]

More significantly, as described in detail below, the government has not proven that Ferrara is now, after serving the equivalent of an eighteen-year sentence, more likely to commit further crimes than a

---

**14.** The 1988 Manual stated that:

A departure under this provision is warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes. Examples might include the case of a defendant who (1) had several previous foreign sentences for serious offenses, (2) had received a prior consolidated sentence of ten years for a series of serious assaults, (3) had a similar instance of large scale fraudulent misconduct established by an adjudication in a Securities and Exchange Commission enforce-

ment proceeding, (4) committed the instant offense while on bail or pretrial release for another serious offense or (5) for appropriate reasons, such as cooperation in the prosecution of other defendants, had previously received an extremely lenient sentence for a serious offense. The court may, after a review of all the relevant information, conclude that the defendant's criminal history was significantly more serious than that of most defendants in the same criminal history category, and therefore consider an upward departure from the guidelines. However, a prior arrest record itself shall not be considered under § 4A1.3.

person in Criminal History category III. Accordingly, to fashion a remedy that to the extent possible restores Ferrara to the circumstances that would have existed if the government had not deprived him of Due Process and that properly protects the public, the court deems Criminal History Category III to be the maximum appropriate category to be considered in this resentencing. Criminal History category III is being used to calculate Ferrara's advisory Guidelines range, despite Ferrara's possibly meritorious claim that his category is I.

### G. *Acceptance of Responsibility*

■ In the April 12, 2005 Memorandum, at 114, the court wrote that its "tentative view is that, on the present record at least, Ferrara should [on resentencing] be denied" a downward adjustment for acceptance of responsibility. *Ferrara*, 2005 WL 903196 at *51. However, the record has now been substantially amplified and, as explained below, Ferrara has proven that he is entitled to a reduction for acceptance of responsibility.

In the Presentence Report, the Probation Department recommended that Ferrara be given a two-level downward adjustment, pursuant to § 3E1.1, for acceptance of responsibility. In doing so, the Probation Department did not rely exclusively on Ferrara's guilty plea. Rather, it focused on him individually and wrote, among other things:

> Compared with the other defendants in this indictment, Vincent Ferrara was more cooperative and more responsive.

To distinguish this fact, the Probation Officer included a two level reduction. PSR, Addendum, p. 4.

In 1992, the government objected to Ferrara's receiving a reduction for acceptance of responsibility. The court noted that the issue was "immaterial since [ ] the sentence to be imposed has been agreed upon and [the court] must either accept or reject it." Apr. 29, 1992 Tr. at 13. The court understood that the parties had agreed that Ferrara and his codefendants would remain silent with regard to the factual basis for their guilty pleas and, in return, would not receive a downward adjustment for acceptance of responsibility. *Cf. Carrozza*, 807 F.Supp. at 157. This permitted the defendants neither to admit nor to deny the existence of the LCN or their membership in it.[15] This approach followed the precedent developed when this court sentenced Patriarca Family members DiGiacomo, Spagnolo, and Vincent Gioacchini. *See* Apr. 29, 1992 Tr. at 12–13. Viewing the matter as immaterial, to follow this precedent and honor the intention of the plea agreement, the court decided to "treat[ ] [Ferrara] the same way as the other four co-defendants," Russo, Carrozza, Lepore, and Tortora, and not grant the reduction for acceptance of responsibility. *Id.* at 13.

In doing so, the court stated that "[t]he principal reason for acceptance of responsibility is that it gives the court some assurance that a person is less likely to be dangerous in the future." *Id.* This remains the court's view. As this resentencing requires the court to assess whether Ferrara is likely to be dangerous if released, it is necessary and appropriate to evaluate

---

**15.** Just before the Rule 11 plea colloquies on January 22, 1992, Russo stated that he intended to assert in court that he was not admitting the existence of the LCN. As a result, the parties promptly renegotiated his plea agree-

ment. Russo was allowed to make a brief statement and in return agreed to accept a sentence of sixteen years, rather than fifteen years as originally agreed. *See Carrozza*, 807 F.Supp. at 157 n. 2; Jan. 22, 1992 Tr. at 82.

whether Ferrara has proven that he is now entitled to a reduction in his Offense Level for acceptance of responsibility.

The court finds that Ferrara has demonstrated that he has accepted responsibility for the crimes to which he properly pled guilty. Ferrara has consistently admitted that he committed all of the crimes to which he pled guilty except for the charges relating to the Limoli murder. It has not been proven that Ferrara has falsely denied complicity in the Limoli homicide. Rather, as explained in the April 12, 2005 Memorandum, this court now seriously doubts that Ferrara was involved in that crime. *Ferrara*, 2005 WL 903196 at *3, 13, 46. Moreover, Ferrara has not denied the existence of the LCN or his membership in it. Instead, he has only exercised his right to remain silent with regard to the factual basis for his plea. *See Carrozza*, 807 F.Supp. at 157 n. 2 (citing cases).

At the May 3, 2005 resentencing hearing, Ferrara acknowledged his criminal past and promised not to resume it when released. More specifically, he stated:

> Please be assured that I am not intending on revisiting my past. To do so would qualify me for the Hall of Fame for Idiots and totally embarrass me and my family.
> If afforded the opportunity, I want to test the other side of my brain with worthwhile projects. Most certainly, I never want to be separated from my children and family again. This is my only fear.
> I am intent on rebonding with my children and family, reorienting myself with the real world and all its changes, and reinventing myself. This time I will do my family proud.

May 3, 2005 Tr. at 152. Having had the opportunity to observe Ferrara closely over many years, this court finds Ferrara's statement to be sincere and meaningful.

*See* § 3E1.3 Background, noting the importance of "sincere remorse;" *United States v. Knight*, 905 F.2d 189, 192 (8th Cir.1990) (a guilty plea and expression of sincere remorse give the court discretion to grant a reduction for acceptance of responsibility); *United States v. Blanco*, 888 F.2d 907, 911 (1st Cir.1989) (" 'The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.' " (quoting § 3E1.1 application note 5)); *United States v. De Leon Ruiz*, 47 F.3d 452, 455 (1st Cir.1995) (acceptance of responsibility serves the purpose of recognizing a defendant's sincere remorse).

The court recognizes that a guilty plea does not entitle a defendant to a reduction for acceptance of responsibility as a matter of right. *See Blanco*, 888 F.2d at 911. Usually, however, defendants who plead guilty, even during trial, are given the reduction unless they engage in some conduct inconsistent with genuine acceptance of responsibility. Blanco, for example, blamed his involvement in drug dealing on others and was not candid about his own conduct. *Id.* Summarizing the relevant case law, a leading treatise states:

> [T]he defendant's guilty plea has been held to be insufficient to warrant the reduction where defendant, even after pleading guilty, minimizes the criminal conduct, lies about the offense, falsely denies important facts, or refuses to disclose the location of the proceeds of the crime. Similarly, where defendant pled guilty and then attempted to obtain a dismissal on a frivolous point, the district court held that his conduct was inconsistent with acceptance of responsibility. The courts have also rejected acceptance credit where the defendant's plea did not come until the "eleventh hour," and where the defendant never admitted that he committed the crime.

Haines, Bowman, & Woll, *Federal Sentencing Guidelines Handbook* 1212–13 (Nov.2004 Ed.) (footnotes omitted). Ferrara did plead guilty at the "eleventh hour." Otherwise, none of the foregoing considerations exist in his case.

In addition, in cases involving other members of the Patriarca Family assigned to this court, the United States Attorney has recently entered into binding plea agreements that provide a reduction for acceptance of responsibility despite the fact that the defendants, Frederick Simone and Vincent Gioacchini, have expressly stated that they are not acknowledging the existence of the LCN or their membership in it. *See* Exhibit 5 (March 15, 2005 Simone plea agreement); Exhibit 4 (March 24, 2005 Simone Tr. at 25–6); Ex. 6 (Feb. 1, 2005 Gioacchini plea agreement); Gioacchini March 7, 2005 Tr. at 26.[16] The government has not objected to the Probation Department's recommendations that Simone and Gioacchini get reductions for acceptance of responsibility.

As the government's recent agreements indicate, it is appropriate in some cases to grant a member of the Patriarca Family a reduction for acceptance of responsibility even if he does not expressly admit the existence of the LCN or his membership in it. At this time, Ferrara's is such a case.

The court recognizes that in 1992, Ferrara had failed to take various actions which are indicia of acceptance of responsibility; for example, he had not voluntarily withdrawn from the RICO conspiracy. *See* § 3E1.1 Application Note 1(a). Nev-ertheless, in view of all of the relevant factors, it is this court's considered judgment that Ferrara has proven that he is now entitled to a two-level reduction for acceptance of responsibility.

### H. *Calculation of the Guidelines Range*

■ Having earned all available "good time" credits, Ferrara has now served the equivalent of a 213–month sentence. *See* 18 U.S.C. § 3624(b); *Ferrara*, 2005 WL 903196 at *52 n. 28; Apr. 12, 2005 Order transmitting memorandum from Probation Department regarding Vincent Ferrara Calculations. As described in detail earlier, neither the Limoli, DiFronzo, Corlito nor Grasso murders can properly be used to calculate the Guidelines range for Ferrara's corrected sentence or the sentence to be imposed.

As described earlier, Ferrara is given a three-level enhancement for his role in the Weinstein extortion. If he is also given the two-level reduction for acceptance of responsibility he now merits, and is treated as being in Criminal History category III, he is a 32–III and the Guidelines range for his sentence is 151 to 188 months.

If only Ferrara's role in the Weinstein extortion is now addressed, without the murders and any reduction for acceptance of responsibility, Ferrara is a 34–III and the Guidelines range for his sentence is 188 to 235 months.

If Ferrara receives a reduction for acceptance of responsibility and is also given

---

**16.** In striking contrast to the government's inventive, unmeritorious efforts to punish Ferrara at resentencing for alleged relevant conduct, with regard to Simone and Gioacchini the government has agreed to dismiss counts of the indictment that "might be deemed relevant conduct" and that "it will not seek an evidentiary hearing or otherwise offer evidence to prove these or other uncharged offenses at sentencing." Viewed in its best light, these agreements are an expression by the government of the view that in some cases involving members of the LCN it is permissible and appropriate to ignore relevant conduct in fashioning a sentence. *See* Ex. 5, ¶ 3(c); Ex. 6, ¶ 3(c).

a three-level upward adjustment for his role in the RICO enterprise, he would be a 35–III and the Guidelines range for his sentence would be 210 to 262 months.[17]

If because the merits of all recently raised issues should now be resolved, Ferrara's Criminal History category is most likely I, and his Guidelines range would in the foregoing circumstance be either 121 to 151 months (32–I), 151 to 188 months (34–I), or 168 to 210 months (35–I).

It is now most equitable and appropriate to provide Ferrara the reduction for acceptance of responsibility because the government's unlawful conduct has necessitated this resentencing. Thus, the Guidelines range for Ferrara's sentence is 151 to 188 months. If originally sentenced to 151 months, Ferrara would have been released on October 31, 2000. If sentenced to 188 months, he would have been released on July 8, 2003. Thus, on the most appropriate Guidelines calculation, the government's misconduct has caused Ferrara to serve about two to four and one-half extra years in prison.

If Ferrara's Guidelines range were 188 to 235 months, time-served, about 213 months, would be the most appropriate feasible sentence. As described in *Carrozza* and in the April 12, 2005 Memorandum, the linked binding plea agreements provid-ed the government with important benefits. *See Carrozza*, 807 F.Supp. at 161–65; *Ferrara*, 2005 WL 903196 at *2, 12, 52. "Among other things, it obtained convictions without a lengthy trial, which would have involved the disclosure of fearful witnesses, and inherently had an uncertain outcome." *Ferrara*, 2005 WL 903196 at *52. As described earlier, in return, each of the defendants participating in the linked, binding plea agreements was to be given a downward departure, except for Lepore. *See Carrozza*, 807 F.Supp. at 158. Significantly, Russo, whose Guidelines range was life in prison because of his responsibility for the Barboza murder, received a downward departure to sixteen years. Therefore, a sentence of 213 months, or almost eighteen years, for Ferrara would now certainly be most reasonable, if his Guideline range were, contrary to the court's conclusion, most appropriately deemed to be 188 to 235 months.[18]

## I. The § 3553(a) Factors

Consideration of the § 3553(a) factors reinforces the decision that Ferrara should be resentenced to time-served rather than given an upward departure as the sentence of twenty-two years that the government advocates would require. Indeed, even if twenty-two years were within the Guidelines range, time-served would

---

**17.** The court would not consider the government's recent claim that Ferrara should receive an additional three levels for his role in the offense if it did not also reopen the acceptance of responsibility issue. To do so would be absolutely incompatible with the goal of restoring Ferrara to the circumstances that would have existed in the absence of the government's unconstitutional conduct.

**18.** Because Ferrara has not been proven to be responsible for murder as part of the RICO and RICO conspiracy charges to which he pled guilty, the maximum sentence for each of counts 1 and 2 is twenty years in prison and the maximum term of Supervised Release is three years. *See* 18 U.S.C. § 1963(a); 18 U.S.C. § 3583(b)(2). In addition, the Guidelines range for his Supervised Release is two to three years, rather than the five years understood to be applicable at Ferrara's original sentencing because of his being punished as responsible for the Limoli murder. *See* U.S.S.G. § 5D3.2(b)(2). The court will sentence Ferrara to three years of Supervised Release. In the interest of completeness, however, the court notes that even if five years of Supervised Release were authorized, three years would be within the Guidelines range, *see* U.S.S.G. § 5D3.2(b)(1), and is the term of Supervised Release the court would impose.

be the most reasonable and appropriate sentence.

As described earlier, under *Booker*, the court must tailor the sentence in light of other § 3553(a) statutory concerns as well as the advisory Guidelines range. *Booker*, 125 S.Ct. at 757. Section 3553(a) begins by stating that "the court shall impose a sentence sufficient, but not greater than necessary, to comply with" the statutory purposes of sentencing.

The court has considered the nature and circumstances of Ferrara's offenses and his characteristics and history. *See* § 3553(a)(1). When arrested in 1989, Ferrara was a dedicated, dangerous criminal. He was also a graduate of Boston College and an educated individual who cared deeply for his family. As the court observed in sentencing Ferrara in 1992, these qualities can coexist in an individual. *See Carrozza*, 807 F.Supp. at 162–3.

Ferrara's history now includes the almost sixteen years he has spent in prison. As discussed below, the prison telephone calls the government has introduced, among other things, demonstrate that Ferrara remains deeply dedicated to his family, and is both able to obey rules and determined to do so in the future.

The almost sixteen years that Ferrara has served are adequate both to deter him from committing crimes in the future and to discourage others who might be tempted to emulate his earlier example. *See* § 3553(a)(2)(B). It is a serious sentence which provides just punishment for the crimes to which Ferrara properly pled guilty. *See* § 3553(a)(2)(A). For these purposes, additional time in prison would have no marginal utility.

Additional time in prison is also not needed to provide Ferrara any educational or vocational training or correctional treatment. *See* § 3553(a)(2)(D). Moreover, continued incarceration would be contrary to the statutory goal of providing Ferrara with needed medical care. *Id.* The evidence, including the recorded telephone calls, indicates that Ferrara suffers from severe headaches of undiagnosed origin, has had at least one invasive procedure to test his heart that did not result in an explanation for his difficulties, and suffers from other undiagnosed ailments. Russo died in prison before serving his full sentence. The evidence is insufficient for the court to determine just how serous Ferrara's medical problems are. However, Russo's death is a reminder that unless a longer sentence is necessary to serve other legitimate interests, Ferrara should have an opportunity to seek medical care from doctors of his choice rather than run the risk of suffering a similar fate.

Sentencing Ferrara to the equivalent of a sentence of about eighteen years will also serve the statutory purpose of diminishing unwarranted disparities among defendants with similar records who have been found guilty of similar conduct. *See* § 3553(a)(6). As described earlier, Russo, the Consigliere, whose Guidelines range was life in prison, received a sixteen-year sentence. Carrozza, a Capo like Ferrara, received a nineteen-year sentence.

Nevertheless, as the court wrote on April 12, 2005, it "would not exercise its discretion to release Ferrara now if it were proven that he is likely to be a danger to the community." *Ferrara*, 2005 WL 903196 at *53. The court has carefully considered all of the evidence and concludes that this has not been proven.[19]

---

**19.** The conclusion that it has not been proven that Ferrara is not likely to be dangerous if released is based on all of the evidence and information the court has received, and its observations of Ferrara, over the past fifteen years. It is not based solely on the recorded

As the government argues, Ferrara has not publicly renounced his membership in the LCN. Membership in the LCN is a factor that favors a finding of dangerousness. It cannot, however, be the end of any inquiry. *See United States v. Patriarca,* 948 F.2d 789, 794 (1st Cir.1991) ("The two cases [of Tortora and Patriarca] provide a vivid example of the error of lumping defendants together based solely on their alleged Mafia membership."); *United States v. Tortora,* 922 F.2d 880, 882 (1st Cir.1990) ("Detention decisions must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant.").

The government has Organized Crime informants and has in recent years conducted electronic surveillance directed at members of the remnant of the Patriarca Family. It has presented no information derived from such sources to indicate that Ferrara is expected to resume active involvement in the LCN, let alone try to regain a leading role in it.

As requested by the government, the court has listened to about five hours of Ferrara's recorded telephone calls from Allenwood prison from November 2004 to March 2005. These recordings represent about 10% of Ferrara's calls in that period and include the conversations that the government expected to be most damaging to Ferrara. The tone and context of the conversations is important to the court's conclusion that the recorded calls, on balance, indicate that Ferrara is not likely to be dangerous if released from prison now. The plethora of other evidence, on balance, reinforces this conclusion.

The calls are to old friends of Ferrara's, some of whom are convicted felons and one of whom, Johnny Cincotti, was once a dangerous member of the LCN. However, the Bureau of Prisons approved Ferrara's calls to these individuals.

If Ferrara is discharged, he will be on Supervised Release for three years on the Standard Conditions. One of these conditions will be that Ferrara not associate with anyone engaged in criminal activity or with any known felon without the approval of his Probation Officer. Ferrara has in prison demonstrated his capacity to follow rules. More specifically, there is no evidence that he has violated any prison rule, and he has been granted all available good-time credits. Moreover, in one of the recorded conversations, Ferrara explains that in prison you have to follow the rules and that it is "easy" to do so. Dec. 2, 2004 Telephone Call ("TC") # 2. Ferrara is also capable of obeying the conditions of his Supervised Release and has strong incentives to do so.

The recorded conversations make it clear that Ferrara is not well-connected to the remnant of the Patriarca Family. He often asks about people he knew many years ago, including some former criminal associates among numerous other individuals. However, several weeks after the event, Ferrara did not know that the Boss of the Family, 91–year–old "Sonny Boy" Rizzo, had died. Feb. 1, 2004 TC. When Ferrara was told that his name was not mentioned at Rizzo's wake, he said, "that is a good thing." *Id.* It appears from the calls that Ferrara has never met the alleged current Boss, Carmen DiNunzio. Dec. 16, 2004 TC. Although Frank Imbruglia, who was one of Ferrara's colleagues in the dissident faction of the Patriarca Family, is on Ferrara's approved call list, they did not speak between November 2004 and March 2, 2005.

prison telephone calls that were admitted on May 3, 2005 and discussed below.

In his telephone conversations, Ferrara expresses no anger or vindictiveness, even when briefly discussing Mercurio, who betrayed him. Nov. 3, 2004 TC. Rather, much of his conversation concerns the Red Sox, the Patriots, and Boston College football and basketball.

Significantly, Ferrara frequently and sincerely discusses how much he wants to spend time with his elderly, ailing mother, his sister and his brother, who has had brain surgery. Dec. 5, 2005 TC; Jan. 8, 2005 TC; Mar. 1, 2005 TC. At one point, he says that he does not intended to go back to the North End Club he used to frequent because "who needs that nonsense." Instead, he says, he wants to be with his family. Mar. 1, 2005 TC.

Ferrara also repeatedly refers to how much he wants to spend time getting to know his children.[20] He tells a friend that he eventually wants to get a two-bedroom apartment and live with his son, who is struggling doing construction work. Mar. 2, 2005 TC. At one point, he asks that friend briefly to ask DiNunzio if he can find his son a better job. Jan. 1, 2005 TC. This is, however, only one of several similar requests Ferrara made on behalf of his son, and evidently nothing came of the request. Jan. 8, 2005 TC.

At the May 3, 2005 hearing, the government played what it apparently views as its best evidence of Ferrara's future dangerousness, Ferrara's call to Cincotti on January 2, 2005. The court does not doubt that in his time, Cincotti was, like Ferrara, a dangerous criminal. However, Ferrara and Cincotti have evidently not remained close, and each has aged substantially.

More specifically, when they spoke in 2005, Ferrara did not know that Cincotti had been released from prison in 1997 or that he had recently successfully completed his Supervised Release. Cincotti does not talk about returning to a life of crime. Rather, as an accomplished cook, he is thinking about opening a restaurant, but not in the Italian North End where the business is too competitive. Jan. 2, 2005 TC.

The government argues that in their telephone conversation, Ferrara expresses his intention to see Cincotti regularly and that this is compelling proof that Ferrara intends to resume his life in Organized Crime. The tone and context of that discussion contradict the government's contention. Cincotti, who also served time at Allenwood, asks Ferrara about the food. Ferrara responds that it is terrible. Laughing and obviously joking, Cincotti tells Ferrara that he will cook for him every night. Ferrara, in the same, jocular tone, says that he will be there. *Id.*

The credible evidence provides reasonable assurance that Ferrara will not resume his life of crime with Cincotti, his other former colleagues, or alone. Ferrara has an opportunity to live in the suburbs with his daughter in a home that the Probation Department regards as suitable. His Probation Officer will work with Ferrara to find him legitimate employment. Ferrara knows that if he violates the conditions of his Supervised Release by committing crimes or associating with convicted felons he is likely to get caught and incarcerated again. He genuinely

---

**20.** Ferrara also expresses his disappointment that he has not heard from his wife for several years, and understanding rather than anger about this. Dec. 5, 2004 TC. He says he hopes that someone will send him *The Wedding* and *The Guardian*, two novels by Nicholas Sparks. *Id.* According to its cover, *The*

*Wedding* is about a man whose wife "has fallen out of love with him." Nicholas Sparks, *The Wedding* (2003). The first lines of the novel's Prologue, at 1, are: "Is it possible, I wonder, for a man to truly change? Or do character and habit form the immovable boundaries of our lives?"

does not want to be separated again from his mother, his siblings, and his children. Ferrara has sufficient intelligence and discipline to act in his own self-interest and obey the law. While it is impossible to be certain, the court is persuaded that he is likely to do so if released now.

Ferrara's release now will also serve the statutory purpose of promoting respect for the law. As this court wrote in *Ferrara*, 2005 WL 903196 at *53, it will assure that Ferrara does not serve more time than necessary or appropriate because of the government's unlawful conduct.

This resentencing results from the government's egregious violation of its clear constitutional duty to disclose material evidence negating guilt to defendants. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). With regard to Auerhahn, the violation was intentional. *Ferrara*, 2005 WL 903196 at *10 n. 9. As United States Attorney Michael Sullivan wrote to this court on October 2, 2003, "adherence to [the government's] evidentiary obligations are the foundations of our judicial system and help assure the fairness of our trials." Echoing this statement in one of his Allenwood conversations, Ferrara says that at this point, this case is not really about him, it is about the system. "How," he says, "can the system work if you've got prosecutors lying, fabricating documents and forcing witnesses to lie...." March 1, 2005 TC.

Not accepting any of the government's proffered pretexts for sustaining the twenty-two year sentence it unlawfully obtained should serve as a reminder that, as the Supreme Court wrote in 1935:

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.... He may prosecute with earnestness and vigor—indeed he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

Most federal prosecutors are conscientious and successful in discharging the constitutional duties that are fundamental to the powerful public office that they hold. They may not need this reminder.

Those who prosecuted Ferrara, however, evidently do. At the May 3, 2005 hearing, Herbert complained that this case had become "a game of gotcha with respect to the government." May 3, 2005 Tr. at 61. However, it is the government that has treated the prosecution of Ferrara as a game—a game of hide and seek of the precise sort that the Supreme Court has recently condemned in another case involving the government's constitutional duty to disclose material exculpatory evidence. As the Court wrote:

A rule [ ] declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process. Ordinarily, we presume that public officials have properly discharged their official duties. We have several times underscored the special role played by the American prosecutor in the search for truth in criminal trials. Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] ... plainly rest[ing] upon the prosecuting attorney, will be faithfully observed. Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation. *See Kyles*, 514 U.S. at 440, 115 S.Ct. 1555, 131 L.Ed.2d

490 ("The prudence of the careful prosecutor should not ... be discouraged."). *Banks v. Dretke,* 540 U.S. 668, 696, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (some citations omitted).

Ferrara has now served several years longer in prison than he should have. Correcting his sentence to reduce the injury inflicted by the government's unlawful conduct should promote respect for the law by giving integrity to the Supreme Court's direction that "[p]rosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation." *Id.*

## V. CONCLUSION AND ORDER

In view of the foregoing, Ferrara's sentence shall be corrected, and he shall be resentenced to time-served, which is the equivalent of a 213–month sentence. He shall also be sentenced to three years of Supervised Release on conditions that will prohibit him from committing crimes, from associating with people who are committing crimes, and from associating with known felons. As described earlier, this is a sentence that is longer than the properly calculated Guidelines require. At worst, it is a sentence that is arguably within the Guidelines range. However, even if time-served is deemed a non-Guidelines sentence, it is the most reasonable and appropriate sentence to provide, in this § 2255 proceeding, an equitable remedy for the government's violation of Ferrara's constitutional right to Due Process.

Accordingly, it is hereby ORDERED that Ferrara shall be resentenced consistent with decisions in this Memorandum on May 13, 2005, at 10:30 a.m.