# United States Court of Appeals
## For the First Circuit

No. 11-2206

IN RE: JEFFREY AUERHAHN

APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

Before

Torruella, Ripple[*] and Howard,
Circuit Judges.

Nancy E. Kaufman, First Assistant Bar Counsel, Office of Bar Counsel, for appellant.

Peter B. Krupp, with whom Max D. Stern was on brief, for amicus curiae Massachusetts Association of Criminal Defense Lawyers, Inc. in support of appellant.

Michael D. Ricciuti, with whom Michael DeMarco, Ryan M. Tosi, Lindsay S. Bishop, and K&L Gates LLP were on brief, for appellee.

Vijay Shanker, Attorney, United States Department of Justice, with whom Lanny A. Breuer, Assistant Attorney General, and John D. Buretta, Acting Deputy Assistant Attorney General, were on brief, for amicus curiae United States in support of appellee.

Lawrence J. Fox, John Reinstein, and Nancy Gertner on brief for amici curiae legal academics in support of appellant.

July 22, 2013

---

[*]Of the Seventh Circuit, sitting by designation.

**HOWARD, Circuit Judge**.  Massachusetts Bar Counsel ("Bar Counsel") appeals a decision by a three-judge panel of the United States District Court for the District of Massachusetts dismissing Bar Counsel's petition for disciplinary sanctions against Assistant United States Attorney Jeffrey Auerhahn.  We dismiss the appeal for lack of jurisdiction.

## I. Background

Following the revelation that Auerhahn and others had withheld exculpatory information from two federal criminal defendants who were convicted and served substantial terms in prison, the Massachusetts district court asked Bar Counsel to investigate Auerhahn's conduct and recommend whether to initiate disciplinary proceedings.  Bar Counsel did so, and the court appointed a three-judge panel (the "Panel") to determine whether to sanction Auerhahn.  The Panel concluded that Auerhahn had not violated any rules of professional conduct and declined to sanction him.  Bar Counsel appeals on the grounds that the Panel abused its discretion and incorrectly interpreted the applicable disciplinary rules.  We begin with an abridged version of the Panel's findings of fact, which are largely undisputed on appeal.

## A. Investigation of Vincent Limoli's Murder

In 1985, the Department of Justice hired Auerhahn as a special attorney assigned to the Organized Crime and Racketeering Section of the New England Strike Force ("Strike Force"). He remained with the Strike Force until 2005, when he was reassigned to another unit in the United States Attorney's Office for the District of Massachusetts, where he remains.

Among Auerhahn's duties while with the Strike Force were the investigation and prosecution of members of the Patriarca crime family of La Cosa Nostra, an organized criminal enterprise operating in, among other places, Boston's North End neighborhood. Early in his career with the Strike Force, Auerhahn became the lead attorney in an investigation into whether Vincent Ferrara, a "soldier" in La Cosa Nostra, was involved in the 1985 murder of Vincent Limoli, an associate in a crew under Ferrara's direction. Auerhahn worked closely with Martin Coleman, a Boston Police Department detective, and Michael Buckley, an FBI special agent, who were both assigned to the Strike Force. Auerhahn also worked with Gregg Sullivan, another Assistant United States Attorney.

Limoli was murdered on October 28, 1985. Pasquale Barone and Walter Jordan, who worked for Ferrara, were both seen with Limoli shortly before his murder, and both fled Boston soon after the murder.

In 1988, Ferrara was under investigation for his potential involvement in numerous murders. In furtherance of the investigation into these murders, Jordan was arrested on a material witness warrant. Upon being arrested, Jordan quickly began cooperating with the government and provided the Strike Force with information on Ferrara, and on La Cosa Nostra generally. Jordan entered into an agreement with the Department of Justice, represented by Auerhahn, regarding his cooperation in the Ferrara investigation. Under the agreement, Jordan was to provide full and truthful knowledge about Ferrara and his enterprise to the government in exchange for nearly complete immunity from any related criminal prosecution, as well as entrance into the Federal Witness Protection Program.

As part of his cooperation with the government, Jordan spoke with several members of the Strike Force. He admitted to having been involved in Limoli's murder and explained that Barone killed Limoli on Ferrara's orders because Limoli had stolen a bag containing cocaine, money, and guns from another associate of La Cosa Nostra. Jordan's sole source of information about Ferrara's involvement in the Limoli murder was Barone.

One week after his arrest, Jordan testified before a grand jury to the details of Limoli's murder. Jordan testified that Barone told him that Limoli had "gotten the 'X'" and was no longer "under Vincent Ferrara's wing" because of Limoli's theft.

Regarding the murder itself, Jordan admitted that Barone asked him to help by setting up a meeting with Limoli. Jordan arranged the meeting with Limoli on the pretense of consummating a drug deal with a third party. Instead, Barone met Limoli on his way to the supposed drug deal and shot and killed him.

Jordan also testified to meetings in the days before and after the murder. Several days before Limoli's murder, Jordan was in a car with Barone and another La Cosa Nostra member named Joseph Bottari. At that time, Barone solicited Bottari's assistance in the murder, saying that "Jimmy had to be clipped" and that Ferrara had ordered the hit. Bottari refused to help Barone with the murder.

A few days after the Limoli murder, Jordan and Barone met with Ferrara in a black Lincoln automobile. Ferrara was in the front seat with another man who was unknown to Jordan. Ferrara began asking questions about the Limoli murder that made it appear that he was uninvolved. Jordan testified that he was confused by Ferrara's questions and thought that Ferrara was trying to hide his involvement in the murder from the unidentified person.

A day or two after the meeting in the black Lincoln, Barone was summoned to a North End restaurant to meet with Ferrara. Barone returned from the restaurant within thirty minutes, "hysterical," and told Jordan that they needed to leave town immediately because Ferrara was going to kill them. According to

Jordan, Barone told Jordan that he did not know why Ferrara wanted to kill them.

On or about November 5, 1985 following Barone's meeting at the restaurant, Jordan and Barone left Boston. Jordan went to Myrtle Beach, South Carolina, where Barone visited him in the summer of 1986. In his initial interviews, Jordan told FBI agent Buckley that while they were in South Carolina, Barone discussed killing Limoli and always asserted that Ferrara had ordered the hit.

After his grand jury testimony, Jordan was relocated to Maine to await federal witness protection services. During this time, Jordan met extensively with members of the Strike Force, including Auerhahn. The FBI reports on these interviews indicate that Jordan consistently told the same story about Ferrara ordering the murder of Limoli.

Barone was arrested in Ohio on July 22, 1988, and was interviewed by two members of the Strike Force. Although Barone initially appeared inclined to cooperate, he later ceased all cooperation. In his brief period of cooperation with the government, he largely corroborated Jordan's accounts. Although he denied any involvement with Limoli's murder, Barone stated that the reason for Limoli's murder was Limoli's theft. Barone also confirmed the meetings with Ferrara in the black Lincoln and at the restaurant.

-6-

Following further investigation, Barone and Ferrara were among eight defendants named in a sixty-five count superseding indictment filed in March 1990 in the United States District Court for the District of Massachusetts. Several of these counts related to Ferrara's and Barone's involvement in Limoli's murder. In order to support comprehensive "RICO" charges that were also a part of the indictment, the government had to establish a pattern of racketeering and thus, at least as to Barone, had to prove that Barone had conspired with Ferrara and others to murder Limoli in order to gain, maintain, or advance their positions within the Patriarca family. The government's main theory was that Barone murdered Limoli on Ferrara's instruction in order to move up in La Cosa Nostra and that Ferrara had ordered the hit to vindicate the theft from a "made" La Cosa Nostra member. Jordan's testimony as to Barone's statements that Ferrara had ordered the hit was, therefore, crucial to proving the charges in the indictment.

### B. Preparation for Trial

Between 1988 and 1991, Jordan was in the Witness Protection Program. In anticipation of the trial of Barone and Ferrara scheduled to begin in September 1991, Auerhahn, Sullivan, Coleman, and Buckley met with Jordan in Salt Lake City, Utah from July 22 to 24, 1991 (the "Utah meeting"). Auerhahn and Sullivan took copious notes during the three days of meetings (the "Utah notes").

In these interviews, Jordan again told the Strike Force members about the restaurant meeting and Barone's visit to Myrtle Beach. Jordan explained that when, in South Carolina, he again asked Barone about why Ferrara wanted to kill them, Barone said that he did not know. Jordan also told the Strike Force that his parents told him that Barone was supposed to kill Jordan the night that they killed Limoli because Jordan was a witness. These statements are all reflected in the Utah notes. Concerned that Jordan appeared to be waffling about the crucial link to Ferrara, Sullivan instructed Coleman to talk to Jordan to shore him up.

Late on the night of July 24, 1991, Jordan visited Coleman in his hotel room. Jordan disclosed that he had withheld certain information concerning Ferrara's involvement in the Limoli homicide. According to Bar Counsel, Jordan told Coleman that, after Barone returned from the restaurant, Barone told Jordan that Ferrara wanted to kill them because Barone had not obtained Ferrara's permission to kill Limoli, and thus they had to flee Boston (the "'no permission' statement"). According to Bar Counsel, Jordan thus admitted to having lied when he previously told investigators and the grand jury that Barone had told him Ferrara had ordered the hit and that Barone did not know why Ferrara wanted to kill them. In support of this contention, Bar Counsel pointed to a handwritten memorandum, purportedly authored by Coleman. According to the memorandum, Jordan told Coleman that

when Barone returned from the meeting in the North End restaurant, Jordan learned that Barone "had fucked up, and did not get permission to kill Jimmy Limoli."

By July 26, 1991, the Strike Force members had returned to Boston.  Coleman asked to meet privately with Auerhahn to report on his visit with Jordan in Utah.  When Coleman arrived at their meeting, Auerhahn saw that he was, in Auerhahn's words, "very agitated" and "almost near tears."  Auerhahn even worried that Coleman was "going to have a heart attack" because he was so upset.  Coleman reported to Auerhahn that Jordan had expressed discomfort or uncertainty about some of the testimony that he was to give regarding the Limoli murder.

Bar Counsel alleged in the district court disciplinary proceedings that, in this meeting, Coleman told Auerhahn that "information had been withheld, that Barone had said that [Ferrara] did not order the hit."  In other words, Bar Counsel alleged that Coleman relayed the "no permission" statement to Auerhahn.  Auerhahn countered that Coleman never told him the details of Jordan's statements.  Instead, he claimed that, because Coleman was so upset, he did not ask Coleman specifically what Jordan had told Coleman in the July 24 Utah meeting.  He did acknowledge, however, that Coleman told him generally that Jordan had come to him in his hotel room and admitted to withholding some information.  Auerhahn claimed that he told Coleman to calm down and that they would

-9-

figure out what Jordan said and deal with the repercussions. Auerhahn did not instruct Coleman to document what Jordan told him in Utah.

After his meeting with Coleman, Auerhahn decided that he needed to figure out whether Jordan had been telling the truth about Barone's statements or merely telling the government what he thought that it wanted to hear. Auerhahn arranged for Jordan to telephone from witness protection on July 29, 1991, and both Auerhahn and Coleman were present for the phone call.

Bar Counsel argued that in this phone call, Jordan told Auerhahn about the "no permission" statement. In support of this contention, she again cited the purported Coleman handwritten memorandum. Auerhahn did not recall any specifics of his phone call with Jordan, but he was adamant that the call would not have included the substance of any changed testimony because such sensitive discussions would only have taken place face-to-face.

Whatever the substance of the telephone conversation with Jordan, Auerhahn arranged to meet with him in Minneapolis, Minnesota, which occurred on August 27 and 28, 1991 (the "Minnesota meeting"). Coleman and Buckley also attended this meeting.

Auerhahn testified that in Minnesota, Jordan told him about an event in Myrtle Beach in which Barone, after first saying that Ferrara had not ordered the hit on Limoli, immediately retracted that statement or said that he was joking (the "Myrtle

-10-

Beach statement").        According to Auerhahn, Jordan was "flip-flopping" in the Minnesota meeting as to whether, in South Carolina, Barone had said Ferrara did or did not order the hit.

Auerhahn took notes, but not as copiously as he had in Utah.   Rather than creating a separate set of notes from the meeting, as was his practice, Auerhahn added the information that he garnered at this meeting to a trial outline that he had begun to prepare at some point after the phone call with Jordan (the "Minnesota notes").   Most of the notes reflect Jordan's original account.   For example, the outline indicates that Barone "wouldn't say why" Ferrara wanted to kill Barone and Jordan.   The outline also reflects a few other statements, however.   One note says that Barone told Jordan that they had to leave Boston because Jordan was also supposed to get "whacked."   Another note states that Ferrara might have wanted to kill them because he "didn't approve or order murder," but the note also records that this was said "in South Carolina one time" and that Jordan "pressed [Barone] on it."   The notes do not make any mention of Barone having retracted the statement or otherwise having indicated that he was joking about Ferrara not ordering the hit.

In preparation for the trial of Ferrara and Barone, Auerhahn filed a trial brief with the court on October 16, 1991, setting forth the evidence upon which the government planned to rely.   Auerhahn's brief represented that Jordan would "testify to

-11-

Barone's statement that Limoli was killed on the orders of Vincent Ferrara."

### C. Ferrara's Plea and Barone's Conviction

The trial did not begin in the fall of 1991 as planned. On January 22, 1992, Ferrara pleaded guilty to, among other charges, murder in aid of racketeering and conspiracy to commit murder in the homicide of Limoli, and he was sentenced to twenty-two years in prison. Up to this time, Auerhahn had never disclosed the "no permission" statement or the Myrtle Beach statement to Ferrara's counsel.

In May 1992, Ferrara's and Barone's codefendant Raymond Patriarca pleaded guilty to several charges and was facing sentencing. Auerhahn wrote a letter, dated May 8, 1992, to Patriarca's attorney,[1] providing discovery material in connection with the sentencing hearing, in which he stated:

> Shortly after the murder, Jordan fled Boston at the direction of Barone. (Barone fled as well.) Some time later, Jordan learned the reason why he and Barone were forced to flee. Jordan learned that Barone was supposed to use Jordan to set up Limoli and then kill Limoli and Jordan on the night of October 28, 1985. For failing to follow the order from Vincent M. Ferrara, and for sparing the life of his brother-in-law, Barone had incurred the wrath of Ferrara and proven to be unreliable. Therefore, both Barone and Jordan were in jeopardy if they remained in Boston. On one occasion, however, Barone provided a different reason which compelled Barone and Jordan's

---

[1] The district court received a courtesy copy of this letter.

-12-

flight from Boston. Prior to learning that he too was to be killed, Jordan was told by Barone that they had to leave Boston because Barone did not get permission to kill Limoli. When Jordan pressed Barone on this, Barone immediately retracted the statement, and reiterated that the murder was at Ferrara's direction. Thereafter, Barone never again stated that the murder was anything but a sanctioned hit.

This was the first disclosure Auerhahn made to defense counsel or the court that Barone had ever told Jordan, on any occasion, that Ferrara had not ordered Limoli's murder or that Jordan had made a statement inconsistent with his grand jury testimony.[2] Auerhahn, therefore, did not disclose the substance of the Myrtle Beach statement to defense counsel for nearly a year after he learned it, and not until after Ferrara and Patriarca had already pleaded guilty.

Barone went to trial in 1993, and Jordan testified. In pretrial preparations with Auerhahn and Sullivan, Jordan did not equivocate in his statements that Barone had told him that Ferrara had ordered the Limoli murder. On May 28, 1993, in anticipation of the trial, Sullivan sent a letter on behalf of the government to Barone's counsel. This letter provided details of Jordan's anticipated testimony and, among other things, made the same

---

[2] When asked why he disclosed the Myrtle Beach statement to Patriarca's counsel, Auerhahn testified that they "were litigating Patriarca's sentencing, so [the disclosure] was relative to that sentencing."

disclosure as quoted above from the 1992 letter to Patriarca's attorney.

During Barone's trial, Jordan testified in a manner largely consistent with his grand jury testimony and his statements that Ferrara had ordered the hit. Jordan also testified that Ferrara had been involved in several other La Cosa Nostra murders. The testimony about these other murders had not been disclosed in Jordan's grand jury testimony or in any FBI report or note from Sullivan or Auerhahn which had been turned over to defense counsel. Buckley was called to the stand and cross-examined about these other murders. He testified that the murders had been discussed in several meetings, including meetings in 1991 when Sullivan and Auerhahn had been taking notes. Defense counsel requested a copy of the prosecutors' notes reflecting their meetings with Jordan in 1988 and 1991. In response to an inquiry by the district judge, Auerhahn represented that he had no notes from the 1988 debriefing sessions with Jordan, but that he did have "extensive notes from the Summer of 91." Auerhahn, however, took the position that those notes were not discoverable. The court concluded that the notes might be discoverable if they contained exculpatory information but acknowledged that attorney work product would have to be redacted. The judge directed Auerhahn to provide him, in camera, those portions of the 1991 notes that covered the additional homicides

about which Jordan had testified.  Auerhahn turned over portions of the Utah notes.

On October 29, 1993, Barone was convicted and sentenced to life in prison for conspiracy to commit murder in aid of racketeering and twenty years each for two other counts.  Both Barone and Ferrara later filed petitions pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences.

### D. Habeas Corpus Proceedings

In May 2002, just before Barone was eligible for parole, Jordan contacted the Strike Force and alleged government corruption in the Ferrara and Barone cases.  After Jordan testified regarding intimidation he claimed to have felt from the government to say that Ferrara had ordered the murder of Limoli, Barone and Ferrara amended their § 2255 petitions.  A Department of Justice Task Force investigated Jordan's perjury claims, and on September 3, 2003, the court began hearing testimony concerning these allegations in connection with Barone's and Ferrara's habeas proceedings.

In a conference before the hearing, the court inquired about notes or reports from the government's initial preparation of Jordan.  Upon learning that these notes had not been disclosed in the habeas proceedings, the court ordered the government to produce to defense counsel "any reports or notes made by any participant in the [Utah] meeting regarding any discussion with Jordan at any time."

-15-

Auerhahn responded to the order by turning over only his Utah notes. Auerhahn did not provide the court with the Minnesota notes, which contained his handwritten trial outline of Jordan's expected testimony. On September 5, 2003, during the course of the habeas hearings, Auerhahn testified that he did not find any separate notes from the Minnesota meeting. He stated that he was surprised not to find any notes from that meeting because it was his usual practice to take notes during trial preparation. Auerhahn testified that it was possible that he had the Utah notes with him in Minnesota and that he might have just added to those notes.

Sometime between September 5 and September 24, Auerhahn produced the Minnesota notes to government counsel. These notes had never before been produced. On September 24, as the habeas hearing continued, Auerhahn testified that he found the outline when he went through his files with more care and attention.[3]

On October 3, 2003, the district judge informed the parties that he would grant Barone's habeas petition. Barone subsequently negotiated a plea agreement that resulted in his immediate release from prison. On April 12, 2005, the judge, based on findings highly critical of Auerhahn's professional conduct,[4]

---

[3] From this point forward, our discussion is not taken from the Panel's findings of fact.

[4] In Auerhahn's disciplinary proceedings, the Panel chose not to rely on the district judge's findings for two reasons. First,

-16-

allowed Ferrara's habeas petition, vacated Ferrara's original sentence, and sentenced him to time served with three years of supervised release. Ferrara v. United States, 384 F. Supp. 2d 384 (D. Mass. 2005); Ferrara v. United States, 372 F. Supp. 2d 108 (D. Mass. 2005). We affirmed this decision. Ferrara v. United States, 456 F.3d 278 (1st Cir. 2006).

### E. Disciplinary Proceedings Against Auerhahn

On January 10, 2005, the Office of Professional Responsibility of the Department of Justice ("OPR") issued a 112-page report, finding that Auerhahn acted in reckless disregard of discovery obligations by failing to document Jordan's statements at the Utah meeting, and that he exercised poor judgment by failing to comply with the court order to submit his notes from meetings with Jordan. As a result, the United States Attorney privately disciplined Auerhahn in the form of a written reprimand.

By letter dated June 29, 2007, the district judge requested that Bar Counsel initiate disciplinary action against Auerhahn. The judge also informed the United States Attorney General that the court was initiating disciplinary action because he did not find the OPR sanction to be appropriate. The same day, the court referred the matter to Bar Counsel.

_____

the habeas proceedings involved a lower standard of proof of the government's misconduct. Second, Auerhahn was not personally represented in the habeas proceedings.

Bar Counsel reviewed the pleadings and transcripts from the criminal cases and habeas proceedings, the materials that OPR compiled for its investigation, and correspondence that Auerhahn sent to Bar Counsel. Bar Counsel also met with Auerhahn and other persons with knowledge of the matter. Based on her investigation, Bar Counsel filed a petition for an order to show cause why Auerhahn should not be disciplined. Although Bar Counsel's petition did not set forth specific counts, it alleged three categories of misconduct.

The first category of alleged misconduct arose from Auerhahn's failure to disclose to Barone's and Ferrara's counsel the "no permission" statement and the Myrtle Beach statement. Specifically, Bar Counsel alleged that Auerhahn should have instructed Coleman to memorialize what Jordan told him in Utah, should have disclosed notes based on the Utah meeting, and should have memorialized Jordan's statements at the Minnesota meeting. Bar Counsel asserted that Auerhahn's conduct violated several disciplinary rules, two of which are relevant on appeal. One rule stated,

> A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant . . . of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment.

Mass. Sup. Jud. Ct. R. 3:07, Canon Seven, Disciplinary R. 7-103(B) (1990) ("Rule 7-103(B)").[5]  The other stated,

> It is unprofessional conduct for a prosecutor to fail to make timely disclosure to the defense of the existence of evidence, known to him, supporting the innocence of the defendant. He should at the earliest feasible opportunity, disclose evidence which would tend to negate the guilt of the accused or mitigate the degree of the offense or reduce the punishment.

Mass. Sup. Jud. Ct. R. 3:08, Prosecution Function 7(a) (1990) ("Prosecution Function 7(a)").

The second category of alleged misconduct involved the presiding judge's order at Barone's trial that Auerhahn provide those portions of his notes that covered the additional homicides about which Jordan had testified.  Auerhahn turned over portions of the Utah notes, but not the Minnesota notes.  Auerhahn later told OPR investigators that he had withheld the Minnesota notes because he considered them to be a trial outline and thus protected work product.  Bar Counsel contended that by representing that he had complied with the district court's disclosure order, Auerhahn violated rules prohibiting attorneys from making false statements and disregarding court rules.

---

[5] At the time of the alleged misconduct, Massachusetts state disciplinary rules applied to federal prosecutors in the Massachusetts district court by virtue of a local rule.  D. Mass. R. 83.6(4)(B) (1990).  Congress later enacted a statute subjecting all federal prosecutors to state disciplinary rules.  28 U.S.C. § 530B (1998).

The third category of alleged misconduct concerned Auerhahn's delay in producing the Minnesota notes during Ferrara's and Barone's habeas proceedings. Bar Counsel claimed that Auerhahn intentionally failed to produce the Minnesota notes, violating disciplinary rules requiring compliance with the court's rules and prohibiting dishonesty.

The court concluded that Bar Counsel's petition provided probable cause to believe that Auerhahn had engaged in the alleged misconduct, and it ordered Auerhahn to show cause why he should not be disciplined. Auerhahn answered the petition, and the court appointed the Panel to determine whether to discipline him.

On July 7, 2010, one of the Panel's judges issued an order, docketed as a "Procedural Order," which described the petition as alleging not three, but two categories of professional misconduct: (1) failing to preserve and disclose to defense counsel exculpatory evidence in the Ferrara and Barone prosecutions, and (2) failing to produce the trial outline (that is, the Minnesota notes) in response to the court's order in the habeas corpus proceedings. The procedural order did not mention Auerhahn's failure to produce the Minnesota notes for in camera review in response to the judge's order during Barone's trial. Bar Counsel filed a "Clarification," which highlighted the allegations that the Panel had apparently set aside and asked the court to consider documents relevant to these allegations when determining the scope

of the record.  The court denied Bar Counsel's request, saying only that "Bar Counsel's motion to 'clarify' the issues by adding a third, is denied."

### F. The Panel's Opinion

Following briefing, oral argument, and review of the record, the Panel denied Bar Counsel's petition in all respects.

First, the Panel rejected Bar Counsel's argument that Auerhahn violated Rule 7-103 and Prosecution Function 7(a) by failing to disclose Barone's post-restaurant-meeting "no permission" statement.  Although the statement would have been exculpatory -- the Panel stated that "a fair portion of the government's RICO case would have crumbled" if the statement were true -- Bar Counsel failed to prove by clear and convincing evidence that Auerhahn ever learned of the statement, if it was made at all.  The record did contain a handwritten memorandum by Coleman recounting Jordan's statement that Ferrara wanted to kill Barone and Jordan because Barone did not have Ferrara's permission to kill Limoli, but the memorandum's provenance made it insufficiently reliable to establish the content of Jordan's conversation with Coleman.[6]  Moreover, even if Jordan made the "no permission" statement to Coleman in their Utah meeting, Bar Counsel

---

[6] On appeal, Bar Counsel accepts the Panel's finding that Coleman's memorandum was insufficiently reliable.  Based on other evidence, one member of the Panel concluded that Jordan did tell Coleman about the "no permission" statement.

-21-

failed to prove that Coleman then relayed the statement to Auerhahn when they met in Boston. Although a "very agitated" Coleman told Auerhahn about Jordan's discomfort with his upcoming testimony, Auerhahn testified during the OPR investigation that Coleman's agitation came not from any seriously damaging statement by Jordan, but from being told something in confidence and the possibility of Jordan trying to "play[]" Coleman by discrediting himself to avoid having to testify. The majority of the Panel found Auerhahn's explanation plausible enough to preclude a finding that Auerhahn had actual knowledge of the "no permission" statement.

A majority of the Panel also determined that Bar Counsel failed to prove that Auerhahn's course of action after his meeting with Coleman in Boston violated a disciplinary rule prohibiting a prosecutor from intentionally avoiding the pursuit of evidence. The Panel determined that Auerhahn did not carefully document the Minnesota meeting, but it held that Auerhahn's lack of diligence was not equivalent to intentional avoidance of evidence, and thus was not sanctionable.[7]

The Panel then turned to Auerhahn's failure to disclose, to Barone and Ferrara, Barone's Myrtle Beach statement that Ferrara had not ordered the hit. Based on Auerhahn's notes from the Minnesota meeting, the Panel found that, as of August 28, 1991,

_____

[7] One member of the panel would have found that, after the Minnesota meeting, Auerhahn violated a disciplinary rule by failing to ask Coleman what Jordan had told him in Utah.

-22-

Auerhahn was aware of some strain of the Myrtle Beach statement (that is, that Barone had said that Ferrara did not order Limoli's murder but immediately retracted that statement or said that he was joking).  Nevertheless, Auerhahn had not disclosed the Myrtle Beach statement when Ferrara pled guilty in January 1992 to conspiring to murder Limoli and was sentenced to twenty-two years in prison.  The government did not disclose the Myrtle Beach statement to Barone's counsel until May 1993, shortly before Barone's trial.

The Panel ruled that Auerhahn did not violate any disciplinary rules by failing to disclose the Myrtle Beach statement.  With respect to Ferrara's plea, the Panel stated that "[t]his version of what Barone said to Jordan was mildly exculpatory both on its face and as an inconsistency with Jordan's other testimony, but it is not likely that, without more, it would have substantially affected the jury's decision, especially because the rest of Jordan's testimony tended to inculpate Ferrara." In re Auerhahn, MBD No. 09-10206, 2011 WL 4352350, at *11 (D. Mass. Sept. 15, 2011) (citations omitted).  Accordingly, "[e]arlier disclosure of the Myrtle Beach statement . . . simply would have made no significant difference to Ferrara's plea discussions." Id. at *15. With respect to Barone's trial and conviction, the Panel held that the government's disclosure to Barone was timely because "it was eventually disclosed to defense counsel before Jordan testified." Id.

-23-

Finally, the Panel decided that Auerhahn did not violate his professional responsibilities when he delayed in producing the Minnesota notes in response to the court's order during the habeas proceedings in 2003. Although Auerhahn's counsel conceded that Auerhahn's inital response to the court's order was negligent, the Panel held that negligence is insufficient to establish a violation of the relevant rule. Thus, the Panel denied Bar Counsel's petition for sanctions.

### G. Bar Counsel's Appeal

Bar Counsel appealed, listing herself as the appellant in the docketing statement. Bar Counsel claims that the Panel made three errors: it required Bar Counsel to prove her case by clear and convincing evidence rather than by a preponderance of the evidence, it eliminated charges relating to Auerhahn's failure to disclose the Minnesota notes in the Barone trial, and it interpreted the disciplinary rules as permitting Auerhahn to withhold the Myrtle Beach statement.

Auerhahn moved for summary disposition on the grounds that Bar Counsel had no standing to appeal the Panel's order. We denied summary disposition but asked the parties to address this issue in their briefs.

### II. Analysis

In every case, we must satisfy ourselves of jurisdiction. García-Velázquez v. Frito Lay Snacks Caribbean, 358 F.3d 6, 8 (1st

Cir. 2004). Auerhahn contends that we lack jurisdiction because Bar Counsel has no standing to appeal the Panel's order. Bar Counsel responds that her interest in this case suffices to confer standing to appeal. For the reasons below, we hold that Bar Counsel lacks standing to appeal.

Generally, "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." Marino v. Ortiz, 484 U.S. 301, 304 (1988). Exceptions to this rule are limited. Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund, 582 F.3d 30, 41 (1st Cir. 2009); Microsystems Software, Inc. v. Scandinavia Online AB, 226 F.3d 35, 39-40 (1st Cir. 2000). In disciplinary proceedings, the complainant who brings an attorney's alleged misconduct to the court's attention may not appeal the court's decision. In re Att'y Disciplinary Appeal, 650 F.3d 202, 202-05 (2d Cir. 2011); see Ramos Colon v. U.S. Att'y for the Dist. of P.R., 576 F.2d 1, 5-6, 8-9 (1st Cir. 1978). The Seventh Circuit has held that even a United States Attorney who filed a petition for disciplinary action could not appeal the decision of a disciplinary panel without the district court's permission. In re Echeles, 430 F.2d 347, 350-51 (7th Cir. 1970); In re Teitelbaum, 253 F.2d 1, 1-3 (7th Cir. 1958). Bar Counsel concedes that a private party may not appeal a disciplinary panel's decision, but she asserts that she investigated and prosecuted Auerhahn's case "as a party without

-25-

limitation." As a result, Bar Counsel argues, she has standing to appeal the Panel's decision.

To determine whether Bar Counsel can pursue this appeal as a party, we first examine the Massachusetts district court rules under which she was appointed. When alleged misconduct comes to the attention of a judicial officer, "the judicial officer may refer the matter to counsel for investigation, the prosecution of a formal disciplinary proceeding or the formulation of such other recommendation as may be appropriate." D. Mass. R. ("Local Rule") 83.6(5)(A). The court must appoint either Bar Counsel or another "disciplinary agency which the court deems suitable." Local Rule 83.6(9)(A). If Bar Counsel or another agency declines the appointment, the court must appoint "one or more members of the [court's] bar." Id. "Counsel, once appointed, may not resign without permission of [the] court." Id. Here, the judge referred the matter to Bar Counsel, who accepted the appointment.

After her appointment, Bar Counsel investigated Auerhahn's conduct. Following the procedure required by Local Rule 83.6(5)(C), Bar Counsel then petitioned the court for an order to show cause why Auerhahn should not be disciplined. The court issued the order, and Auerhahn answered the petition. Pursuant to Local Rule 83.6(5)(D), a panel of three district judges was

appointed to hear the matter.[8]  After deciding motions about the scope of the charges against Auerhahn and the evidentiary record, the Panel heard oral argument from attorneys for Bar Counsel and Auerhahn.  The Panel denied Bar Counsel's petition for disciplinary sanctions, and Bar Counsel filed a notice of appeal as "the petitioner in the above named case [i.e., In the Matter of Jeffrey Auerhahn]."  Bar Counsel does not claim that this appeal was authorized by the chief judge, by the next most senior judge who appointed the Panel, by the Panel itself, or by the district court judges acting either collectively or pursuant to a delegation procedure.

We hold that Bar Counsel was not a party to Auerhahn's disciplinary proceedings and thus may not appeal the Panel's decision.  Under the Local Rules, Bar Counsel was appointed as "counsel," not as a party.  Nor does Bar Counsel's name appear in the caption of the case.  Unlike a prosecutor, Bar Counsel was appointed to assist the district court in carrying out its own disciplinary proceedings--a task that the district court could have assigned to any member of its bar.[9]

---

[8] Under Local Rule 83.6(5)(D), the chief judge of the district court sets the matter for a hearing before a three-judge panel, unless the chief judge is the complainant, in which case the next most senior judge assumes the chief judge's responsibilities. Here, the chief judge was the complainant, so the next most senior judge set Auerhahn's hearing and appointed the panel.

[9] Unlike the Local Rules, the rules of the Massachusetts Supreme Judicial Court explicitly permit Bar Counsel to appeal a

Because there is little precedent for an appeal of a district court's decision not to impose discipline, we also look for guidance in the law governing appeals from the somewhat analogous circumstances of a district court's dismissal of a contempt proceeding. The United States may appeal such a dismissal, but this authority is statutory. 18 U.S.C. § 3731; United States v. Goldman, 277 U.S. 229 (1928). By contrast, no statute or rule permits Bar Counsel to appeal the Panel's decision. We believe that Bar Counsel is more akin to the private prosecutors in United States v. McKenzie, 735 F.2d 907 (5th Cir. 1984), whom the district court appointed to advocate criminal contempt for violation of a production order. The district court eventually dismissed the contempt proceedings, and the private prosecutors appealed. The Fifth Circuit dismissed the appeal:

> The dismissal of the [contempt] proceedings effectively revokes the prosecutors' appointment. . . . The private prosecutors who derived their representation authority wholly from the district court . . . have had that authority wholly terminated by that same identical court. . . . The private prosecutors therefore no longer represent the court; they appeal on their own behalf from the court's denial of their application for a show-cause order. Consequently, this Court has no jurisdiction over this peculiar appeal.

decision not to discipline an attorney. Mass. Sup. Jud. Ct. R. 4:01 § 8(6).

-28-

<u>Id.</u> at 911-12.  For the same reason, Bar Counsel's formal involvement in this proceeding ended when the district court denied Bar Counsel's petition.

If any entity has standing to appeal the denial of Bar Counsel's petition, it is the district court itself.  A district court may defend its rules in its own court and on appeal, <u>see</u> <u>Stern</u> v. <u>U.S. Dist. Court for the Dist. of Mass.</u>, 214 F.3d 4 (1st Cir. 2000), and it may appeal a ruling by another court invalidating its rules, <u>see</u> <u>Whitehouse</u> v. <u>U.S. Dist. Court for the Dist. of R.I.</u>, 53 F.3d 1349 (1st Cir. 1995).  Although a district court may have little incentive to appeal its own decision, such an appeal could be appropriate when the district court believes that the court of appeals should clarify or change the applicable law.  <u>See</u> <u>In re Echeles</u>, 430 F.2d at 350-51 (allowing an appeal of a denial of a petition for disbarment when the district court authorized the appeal).  Because the district court did not appeal or authorize the Panel's decision, Bar Counsel cannot pursue this appeal on behalf of the district court.

Although Bar Counsel cannot appeal because she was not a party to this action, <u>Ramos Colon</u>, 576 F.2d at 8-9, we will also evaluate our power of advisory mandamus pursuant to the All Writs Act, which allows federal courts to "issue all writs necessary or appropriate in aid of" their jurisdiction.  28 U.S.C. § 1651.  That act permits this court to "treat an attempted appeal from an

unappealable (or possibly unappealable) order as a petition for a writ of mandamus."  United States v. Horn, 29 F.3d 754, 769 (1st Cir. 1994).  We have explained that

> advisory mandamus is available only in a tiny subset of cases.  Such cases are those that present novel questions of great significance which, if not immediately addressed, are likely to recur and to evade effective review.  The aim of advisory mandamus, then, is to settle substantial questions of law in circumstances that would assist other jurists, parties, [and] lawyers.  To obtain relief under this species of mandamus, the petitioner does not need to show irreparable harm.

United States v. Green, 407 F.3d 434, 439 (1st Cir. 2005) (citations omitted) (internal quotation marks omitted) (alteration in original).  Here, the Panel ruled on two issues of great importance.  First, the Panel decided that a prosecutor's ethical obligations do not require disclosure of all exculpatory evidence to a defendant, holding that a prosecutor may withhold certain exculpatory evidence, such as evidence not required to be disclosed under Brady v. Maryland, 373 U.S. 83 (1963).  Second, the Panel held that disclosure of exculpatory evidence could be timely as long as it occurred before trial, even if the prosecutor withheld the evidence for years.  Appellate rulings on these issues would "assist other jurists, parties, [and] lawyers."  Green, 407 F.3d at 439 (alteration in original) (citation omitted) (internal quotation marks omitted).

Nevertheless, to qualify for advisory mandamus, Bar Counsel must present a justiciable "Case[]" or "Controvers[y]" within the meaning of Article III of the Constitution. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Constitutional standing requires an "injury in fact," a "causal connection between the injury and the conduct complained of," and a likelihood that "the injury will be redressed by a favorable decision." Id. at 560-61 (citations omitted) (internal quotation marks omitted).

Bar Counsel does have a general interest in this case: beyond its role as counsel to the district court, Bar Counsel is charged with investigating and prosecuting attorney misconduct in Massachusetts. Mass. Sup. Jud. Ct. R. 4:01 § 7. Here, Bar Counsel argues that the district court misinterpreted Massachusetts state disciplinary rules by, among other things, reading inappropriate qualifications into rules governing disclosure by prosecutors. But "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." Allen v. Wright, 468 U.S. 737, 754 (1984). The Supreme Court recently reiterated this principle in Hollingsworth v. Perry, 133 S. Ct. 2652 (2013), when it held that a group permitted by California law to represent the State's interest in the validity of a ballot initiate nevertheless lacked standing to

appeal a decision of the district court when the State itself declined to appeal. The Court based its decision partly on the petitioners' lack of an agency relationship with the State.

Bar Counsel's claim to standing is weaker than that of the petitioners in Hollingsworth, since no law vests Bar Counsel with the district court's interest in disciplinary enforcement. Bar Counsel arguably had a particular interest in this case by virtue of Local Rules 83.6(5)(A) and 83.6(9)(A), which allowed the district court to refer the matter to Bar Counsel. But, as we explained above, that particular interest expired when the district court denied Bar Counsel's petition for sanctions. Cf. McKenzie, 735 F.2d at 911-12 ("The dismissal of the [contempt] proceedings effectively revokes the prosecutors' appointment. . . . The private prosecutors who derived their representation authority wholly from the district court . . . have had that authority wholly terminated by that same identical court."). Any agency relationship between Bar Counsel and the district court expired at the same moment. Therefore, we conclude that Bar Counsel lacks standing to appeal the district court's decision.[10]

---

[10] Our decision does not necessarily imply that we agree with the district court's decision or condone Auerhahn's conduct. We have discussed our view of Auerhahn's conduct in Ferrara v. United States, 456 F.3d 278 (1st Cir. 2006).

## III. Conclusion

Because Bar Counsel lacks standing to appeal the district court's decision, the appeal is **<u>dismissed</u>** for lack of jurisdiction.